**RELIGIOUS TECHNOLOGY CENTER, a California non-profit corporation; and Bridge Publications, Inc., a California non-profit corporation, Plaintiffs,**

v.

**NETCOM ON–LINE COMMUNICATION SERVICES, INC., a Delaware corporation; Dennis Erlich, an individual; and Tom Klemesrud, an individual, dba Clearwood Data Services, Defendants.**

No.  C–95–20091 RMW.

United States District Court,
N.D. California.

Nov. 21, 1995.

Helena K. Kobrin, North Hollywood, CA, Andrew H. Wilson, Wilson, Ryan & Campilongo, San Francisco, CA, Thomas M. Small, Janet A. Kobrin, Small, Larkin & Kiddé, Los Angeles, CA, Elliot J. Abelson, Los Angeles, CA, for Plaintiffs.

Randolf J. Rice, Pillsbury, Madison & Sutro, San Jose, CA, for Defendant Netcom On–Line Communication Services.

Harold J. McElhinny, Carla Oakley, Morrison & Foerster, San Francisco, CA, for Defendant Dennis Erlich.

Daniel Leipold, Hagenbaugh & Murphy, Orange, CA, for Defendant Tom Klemesrud.

## ORDER DENYING DEFENDANT NETCOM'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT KLEMESRUD'S MOTION FOR JUDGMENT ON THE PLEADINGS; AND DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST NETCOM AND KLEMESRUD

WHYTE, District Judge.

This case concerns an issue of first impression regarding intellectual property rights in cyberspace.[1] Specifically, this order addresses whether the operator of a computer bulletin board service ("BBS"), and the large Internet[2] access provider that allows that BBS to reach the Internet, should be liable for copyright infringement committed by a subscriber of the BBS.

Plaintiffs Religious Technology Center ("RTC") and Bridge Publications, Inc. ("BPI") hold copyrights in the unpublished and published works of L. Ron Hubbard, the late founder of the Church of Scientology ("the Church"). Defendant Dennis Erlich ("Erlich")[3] is a former minister of Scientology turned vocal critic of the Church, whose pulpit is now the Usenet newsgroup[4] alt.religion.scientology ("a.r.s."), an on-line forum for discussion and criticism of Scientology. Plaintiffs maintain that Erlich infringed their copyrights when he posted portions of their

---

1. Cyberspace is a popular term for the world of electronic communications over computer networks. *See* Trotter Hardy, *The Proper Legal Regime for "Cyberspace,"* 55 U.PITT.L.REV. 993, 994 (1994).

2. "The Internet today is a worldwide entity whose nature cannot be easily or simply defined. From a technical definition, the Internet is the 'set of all interconnected IP networks'—the collection of several thousand local, regional, and global computer networks interconnected in real time via the TCP/IP Internetworking Protocol suite...." Daniel P. Dern, THE INTERNET GUIDE FOR NEW USERS 16 (1994).

    One article described the Internet as
    a collection of thousands of local, regional, and global Internet Protocol networks. What it means in practical terms is that millions of computers in schools, universities, corporations, and other organizations are tied together via telephone lines. The Internet enables users to share files, search for information, send electronic mail, and log onto remote computers. But it isn't a program or even a particular computer resource. It remains only a means to link computer users together.
        Unlike on-line computer services such as CompuServe and America On Line, no one runs the Internet....
        No one pays for the Internet because the network itself doesn't exist as a separate entity. Instead various universities and organizations pay for the dedicated lines linking their computers. Individual users may pay an Internet provider for access to the Internet via its server.
    David Bruning, *Along the InfoBahn,* ASTRONOMY, Vol. 23, No. 6, p. 76 (June 1995).

3. Issues of Erlich's liability were addressed in this court's order of September 22, 1995. That order concludes in part that a preliminary injunction against Erlich is warranted because plaintiffs have shown a likelihood of success on their copyright infringement claims against him. Plaintiffs likely own valid copyrights in Hubbard's published and unpublished works and Erlich's near-verbatim copying of substantial portions of plaintiffs' works was not likely a fair use. To the extent that Netcom and Klemesrud argue that plaintiffs' copyrights are invalid and that Netcom and Klemesrud are not liable because Erlich had a valid fair use defense, the court previously rejected these arguments and will not reconsider them here.

4. The Usenet has been described as

    a worldwide community of electronic BBSs that is closely associated with the Internet and with the Internet community. ¶ The messages in Usenet are organized into thousands of topical groups, or "Newsgroups".... ¶ As a Usenet user, you read and contribute ("post") to your local Usenet site. Each Usenet site distributes its users' postings to other Usenet sites based on various implicit and explicit configuration settings, and in turn receives postings from other sites. Usenet traffic typically consists of as much as 30 to 50 Mbytes of messages per day. ¶ Usenet is read and contributed to on a daily basis by a total population of millions of people.... ¶ There is no specific network that is the Usenet. Usenet traffic flows over a wide range of networks, including the Internet and dial-up phone links. Dern, *supra,* at 196–97.

works on a.r.s. Erlich gained his access to the Internet through defendant Thomas Klemesrud's ("Klemesrud's") BBS "support.com." Klemesrud is the operator of the BBS, which is run out of his home and has approximately 500 paying users. Klemesrud's BBS is not directly linked to the Internet, but gains its connection through the facilities of defendant Netcom On–Line Communications, Inc. ("Netcom"), one of the largest providers of Internet access in the United States.

After failing to convince Erlich to stop his postings, plaintiffs contacted defendants Klemesrud and Netcom. Klemesrud responded to plaintiffs' demands that Erlich be kept off his system by asking plaintiffs to prove that they owned the copyrights to the works posted by Erlich. However, plaintiffs refused Klemesrud's request as unreasonable. Netcom similarly refused plaintiffs' request that Erlich not be allowed to gain access to the Internet through its system. Netcom contended that it would be impossible to prescreen Erlich's postings and that to kick Erlich off the Internet meant kicking off the hundreds of users of Klemesrud's BBS. Consequently, plaintiffs named Klemesrud and Netcom in their suit against Erlich, although only on the copyright infringement claims.[5]

On June 23, 1995, this court heard the parties' arguments on eight motions, three of which relate to Netcom and Klemesrud and are discussed in this order: (1) Netcom's motion for summary judgment; (2) Klemesrud's motion for judgment on the pleadings;[6] and (3) plaintiffs' motion for a preliminary injunction against Netcom and Klemesrud. For the reasons set forth below, the court grants in part and denies in part Netcom's motion for summary judgment and Klemesrud's motion for judgment on the pleadings and denies plaintiffs' motion for a preliminary injunction.

## I. NETCOM'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT

### A. Summary Judgment Standards

Because the court is looking beyond the pleadings in examining this motion, it will be treated as a motion for summary judgment rather than a motion to dismiss. *Grove v. Mead School District,* 753 F.2d 1528, 1532 (9th Cir.1985). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is a "genuine" issue of material fact only when there is sufficient evidence such that a reasonable juror could find for the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). Entry of summary judgment is mandated against a party if, after adequate time for discovery and upon motion, the party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court, however, must draw all justifiable inferences in favor of the nonmoving parties, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 2434–35, 115 L.Ed.2d 447 (1991).

### B. Copyright Infringement

To establish a claim of copyright infringement, a plaintiff must demonstrate (1) ownership of a valid copyright and (2) "copy-

---

**5.** The First Amended Complaint ("FAC") contains three claims: (1) copyright infringement of BPI's published literary works against all defendants; (2) copyright infringement of RTC's unpublished confidential works against all defendants; and (3) misappropriation of RTC's trade secrets against defendant Erlich only.

**6.** Klemesrud alternatively filed a motion for summary judgment, which will not be considered at this time because Klemesrud was unavailable to be deposed in time for plaintiffs' opposition. In a previous order, the court struck those portions of the motion that referred to matters outside of the pleadings.

ing"[7] of protectable expression by the defendant. *Baxter v. MCA, Inc.,* 812 F.2d 421, 423 (9th Cir.), *cert. denied,* 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). Infringement occurs when a defendant violates one of the exclusive rights of the copyright holder. 17 U.S.C. § 501(a). These rights include the right to reproduce the copyrighted work, the right to prepare derivative works, the right to distribute copies to the public, and the right to publicly display the work. 17 U.S.C. §§ 106(1)–(3) & (5). The court has already determined that plaintiffs have established that they own the copyrights to all of the Exhibit A and B works, except item 4 of Exhibit A.[8] The court also found plaintiffs likely to succeed on their claim that defendant Erlich copied the Exhibit A and B works and was not entitled to a fair use defense. Plaintiffs argue that, although Netcom was not itself the source of any of the infringing materials on its system, it nonetheless should be liable for infringement, either directly, contributorily, or vicariously.[9] Netcom disputes these theories of infringement and further argues that it is entitled to its own fair use defense.

## 1. Direct Infringement

Infringement consists of the unauthorized exercise of one of the exclusive rights of the copyright holder delineated in section 106. 17 U.S.C. § 501. Direct infringement does not require intent or any particular state of mind,[10] although willfulness is relevant to the award of statutory damages. 17 U.S.C. § 504(c).

**7.** In this context, "copying" is "shorthand for the infringing of any of the copyright owner's five exclusive rights." *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1085 n. 3 (9th Cir.1989).

**8.** The court has under submission plaintiffs' request to expand the preliminary injunction against Erlich.

**9.** Plaintiffs have argued at times during this litigation that Netcom should only be required to respond after being given notice, which is only relevant to contributory infringement. Nevertheless, the court will address all three theories of infringement liability.

**10.** The strict liability for copyright infringement is in contrast to another area of liability affecting online service providers: defamation. Recent

Many of the facts pertaining to this motion are undisputed. The court will address the relevant facts to determine whether a theory of direct infringement can be supported based on Netcom's alleged reproduction of plaintiffs' works. The court will look at one controlling Ninth Circuit decision addressing copying in the context of computers and two district court opinions addressing the liability of BBS operators for the infringing activities of subscribers. The court will additionally examine whether Netcom is liable for infringing plaintiffs' exclusive rights to publicly distribute and display their works.

### a. *Undisputed Facts*

The parties do not dispute the basic processes that occur when Erlich posts his allegedly infringing messages to a.r.s. Erlich connects to Klemesrud's BBS using a telephone and a modem. Erlich then transmits his messages to Klemesrud's computer, where they are automatically briefly stored. According to a prearranged pattern established by Netcom's software, Erlich's initial act of posting a message to the Usenet results in the automatic copying of Erlich's message from Klemesrud's computer onto Netcom's computer and onto other computers on the Usenet. In order to ease transmission and for the convenience of Usenet users, Usenet servers maintain postings from newsgroups for a short period of time—eleven days for Netcom's system and three days for Klemesrud's system. Once on Netcom's computers, messages are available to Netcom's customers and Usenet neighbors, who may then download the messages to their

decisions have held that where a BBS exercised little control over the content of the material on its service, it was more like a "distributor" than a "republisher" and was thus only liable for defamation on its system where it knew or should have known of the defamatory statements. *Cubby, Inc. v. CompuServe, Inc.,* 776 F.Supp. 135 (S.D.N.Y.1991). By contrast, a New York state court judge found that Prodigy was a publisher because it held itself out to be controlling the content of its services and because it used software to automatically prescreen messages that were offensive or in bad taste. *Stratton Oakmont, Inc. v. Prodigy Services Co.,* 1995 WL 323710, THE RECORDER, June 1, 1995, at 7 (excerpting May 24, 1995 Order Granting Partial Summary Judgment to Plaintiffs).

**1368**

own computers. Netcom's local server makes available its postings to a group of Usenet servers, which do the same for other servers until all Usenet sites worldwide have obtained access to the postings, which takes a matter of hours. Francis Decl. ¶ 5.

Unlike some other large on-line service providers, such as CompuServe, America Online, and Prodigy, Netcom does not create or control the content of the information available to its subscribers. It also does not monitor messages as they are posted. It has, however, suspended the accounts of subscribers who violated its terms and conditions, such as where they had commercial software in their posted files. Netcom admits that, although not currently configured to do this, it may be possible to reprogram its system to screen postings containing particular words or coming from particular individuals. Netcom, however, took no action after it was told by plaintiffs that Erlich had posted messages through Netcom's system that violated plaintiffs' copyrights, instead claiming that it could not shut out Erlich without shutting out all of the users of Klemesrud's BBS.

### b. *Creation of Fixed Copies*

The Ninth Circuit addressed the question of what constitutes infringement in the context of storage of digital information in a computer's random access memory ("RAM"). *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 518 (9th Cir.1993). In *MAI,* the Ninth Circuit upheld a finding of copyright infringement where a repair person, who was not authorized to use the computer owner's licensed operating system software, turned on the computer, thus loading the operating system into RAM for long enough to check an "error log." *Id.* at 518–19. Copyright protection subsists in original works of authorship *"fixed* in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102 (emphasis added). A work is "fixed" when its "embodiment in a copy ... is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more

than transitory duration." *Id.* § 101. *MAI* established that the loading of data from a storage device into RAM constitutes copying because that data stays in RAM long enough for it to be perceived. *MAI Systems,* 991 F.2d at 518.

■ In the present case, there is no question after *MAI* that "copies" were created, as Erlich's act of sending a message to a.r.s. caused reproductions of portions of plaintiffs' works on both Klemesrud's and Netcom's storage devices. Even though the messages remained on their systems for at most eleven days, they were sufficiently "fixed" to constitute recognizable copies under the Copyright Act. *See* Information Infrastructure Task Force, *Intellectual Property and the National Information Infrastructure: The Report of the Working Group on Intellectual Property Rights* 66 (1995) ("IITF Report").

### c. *Is Netcom Directly Liable for Making the Copies?*

■ Accepting that copies were made, Netcom argues that Erlich, and not Netcom, is directly liable for the copying. *MAI* did not address the question raised in this case: whether possessors of computers are liable for incidental copies automatically made on their computers using their software as part of a process initiated by a third party. Netcom correctly distinguishes *MAI* on the ground that Netcom did not take any affirmative action that directly resulted in copying plaintiffs' works other than by installing and maintaining a system whereby software automatically forwards messages received from subscribers onto the Usenet, and temporarily stores copies on its system. Netcom's actions, to the extent that they created a copy of plaintiffs' works, were necessary to having a working system for transmitting Usenet postings to and from the Internet. Unlike the defendants in *MAI,* neither Netcom nor Klemesrud initiated the copying. The defendants in *MAI* turned on their customers' computers thereby creating temporary copies of the operating system, whereas Netcom's and Klemesrud's systems can operate without any human intervention. Thus, unlike *MAI,* the mere fact that Netcom's system incidentally makes temporary copies

of plaintiffs' works does not mean Netcom has caused the copying.[11] The court believes that Netcom's act of designing or implementing a system that automatically and uniformly creates temporary copies of all data sent through it is not unlike that of the owner of a copying machine who lets the public make copies with it.[12] Although some of the people using the machine may directly infringe copyrights, courts analyze the machine owner's liability under the rubric of contributory infringement, not direct infringement. *See, e.g., RCA Records v. All–Fast Systems, Inc.,* 594 F.Supp. 335 (S.D.N.Y.1984); 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 12.04[A][2][b], at 12–78 to –79 (1995) ("NIMMER ON COPYRIGHT"); Elkin–Koren, *supra,* at 363 (arguing that "contributory infringement is more appropriate for dealing with BBS liability, first, because it focuses attention on the BBS-users relationship

and the way imposing liability on BBS operators may shape this relationship, and second because it better addresses the complexity of the relationship between BBS operators and subscribers"). Plaintiffs' theory would create many separate acts of infringement and, carried to its natural extreme, would lead to unreasonable liability. It is not difficult to conclude that Erlich infringes by copying a protected work onto his computer and by posting a message to a newsgroup. However, plaintiffs' theory further implicates a Usenet server that carries Erlich's message to other servers regardless of whether that server acts without any human intervention beyond the initial setting up of the system. It would also result in liability for every single Usenet server in the worldwide link of computers transmitting Erlich's message to every other computer. These parties, who are liable under plaintiffs' theory, do no more

**11.** One commentator addressed the difficulty in translating copyright concepts, including the public/private dichotomy, to the digitized environment. *See* Niva Elkin–Koren, *Copyright Law and Social Dialogue on the Information Superhighway: The Case Against Copyright Liability of Bulletin Board Operators,* 13 CARDOZO ARTS & ENT. L.J. 346, 390 (1993). This commentator noted that one way to characterize a BBS operation is that it "provides subscribers with access and services. As such, BBS operators do not create copies, and do not transfer them in any way. Users post the copies on the BBS, which other users can then read or download." *Id.* at 356.

**12.** Netcom compares itself to a common carrier that merely acts as a passive conduit for information. In a sense, a Usenet server that forwards all messages acts like a common carrier, passively retransmitting every message that gets sent through it. Netcom would seem no more liable than the phone company for carrying an infringing facsimile transmission or storing an infringing audio recording on its voice mail. As Netcom's counsel argued, holding such a server liable would be like holding the owner of the highway, or at least the operator of a toll booth, liable for the criminal activities that occur on its roads. Since other similar carriers of information are not liable for infringement, there is some basis for exempting Internet access providers from liability for infringement by their users. The IITF Report concluded that "[i]f an entity provided only the wires and conduits—such as the telephone company, it would have a good argument for an exemption if it was truly in the same position as a common carrier and could not control who or what was on its system." IITF Report at 122. Here, perhaps, the analogy is not

completely appropriate as Netcom does more than just "provide the wire and conduits." Further, Internet providers are not natural monopolies that are bound to carry all the traffic that one wishes to pass through them, as with the usual common carrier. *See id.* at 122 n. 392 (citing *Federal Communications Commission v. Midwest Video Corp.,* 440 U.S. 689, 701, 99 S.Ct. 1435, 1442, 59 L.Ed.2d 692 (1979)). Section 111 of the Copyright Act codifies the exemption for passive carriers who are otherwise liable for a secondary transmission. 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 12.04[B][3], at 12–99 (1995). However, the carrier must not have any direct or indirect control over the content or selection of the primary transmission. *Id.;* 17 U.S.C. § 111(a)(3). *Cf. infra* part I.B.3.a. In any event, common carriers are granted statutory exemptions for liability that might otherwise exist. Here, Netcom does not fall under this statutory exemption, and thus faces the usual strict liability scheme that exists for copyright. Whether a new exemption should be carved out for online service providers is to be resolved by Congress, not the courts. *Compare* Comment, "Online Service Providers and Copyright Law: The Need for Change," 1 SYRACUSE J.LEGIS. & POL'Y 197, 202 (1995) (citing recommendations of online service providers for amending the Copyright Act to create liability only where a "provider has 'actual knowledge that a work that is being or has been transmitted onto, or stored on, its system is infringing,' and has the 'ability and authority' to stop the transmission, and has, after a reasonable amount of time, allowed the infringing activity to continue'") *with* IITF Report at 122 (recommending that Congress not exempt service providers from strict liability for direct infringements).

than operate or implement a system that is essential if Usenet messages are to be widely distributed. There is no need to construe the Act to make all of these parties infringers. Although copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party.

Plaintiffs point out that the infringing copies resided for eleven days on Netcom's computer and were sent out from it onto the "Information Superhighway." However, under plaintiffs' theory, any storage of a copy that occurs in the process of sending a message to the Usenet is an infringement. While it is possible that less "damage" would have been done if Netcom had heeded plaintiffs' warnings and acted to prevent Erlich's message from being forwarded,[13] this is not relevant to its *direct* liability for copying. The same argument is true of Klemesrud and any Usenet server. Whether a defendant makes a direct copy that constitutes infringement cannot depend on whether it received a warning to delete the message. *See D.C. Comics, Inc. v. Mini Gift*, 912 F.2d 29, 35 (2d Cir.1990). This distinction may be relevant to contributory infringement, however, where knowledge is an element. *See infra* part I.B.2.a.

The court will now consider two district court opinions that have addressed the liability of BBS operators for infringing files uploaded by subscribers.

#### d. *Playboy Case*

*Playboy Enterprises, Inc. v. Frena* involved a suit against the operator of a small BBS whose system contained files of erotic pictures. 839 F.Supp. 1552, 1554 (M.D.Fla. 1993). A subscriber of the defendant's BBS had uploaded files containing digitized pictures copied from the plaintiff's copyrighted magazine, which files remained on the BBS for other subscribers to download. *Id.* The court did not conclude, as plaintiffs suggest in this case, that the BBS is itself liable for the unauthorized *reproduction* of plaintiffs' work; instead, the court concluded that the BBS operator was liable for violating the plaintiff's right to publicly *distribute and display* copies of its work. *Id.* at 1556–57.

■ In support of their argument that Netcom is directly liable for copying plaintiffs' works, plaintiffs cite to the court's conclusion that "[t]here is no dispute that [the BBS operator] supplied a product containing unauthorized copies of a copyrighted work. It does not matter that [the BBS operator] claims he did not make the copies [him]self." *Id.* at 1556. It is clear from the context of this discussion[14] that the *Playboy* court was looking only at the exclusive right to distribute copies to the public, where liability exists regardless of whether the defendant makes copies. Here, however, plaintiffs do not argue that Netcom is liable for its public distribution of copies. Instead, they claim that Netcom is liable because its computers in fact made copies. Therefore, the above-quoted language has no bearing on the issue of direct liability for unauthorized reproductions. Notwithstanding *Playboy*'s holding that a BBS operator may be directly liable for *distributing or displaying* to the public copies of protected works,[15] this court holds

---

**13.** The court notes, however, that stopping the distribution of information once it is on the Internet is not easy. The decentralized network was designed so that if one link in the chain be closed off, the information will be dynamically rerouted through another link. This was meant to allow the system to be used for communication after a catastrophic event that shuts down part of it. Francis Decl. ¶ 4.

**14.** The paragraph in *Playboy* containing the quotation begins with a description of the right of public distribution. *Id.* Further, the above quoted language is followed by a citation to a discussion of the right of public distribution in Jay Dratler, Jr., INTELLECTUAL PROPERTY LAW: COMMERCIAL, CREATIVE AND INDUSTRIAL PROPERTY § 6.01[3], at 6–15

(1991). This treatise states that "the distribution right may be decisive, if, for example, a distributor supplies products containing unauthorized copies of a copyrighted work but has not made the copies itself." *Id.* (citing to *Williams Electronics, Inc. v. Artic International, Inc.*, 685 F.2d 870, 876 (3d Cir.1982)). In any event, the *Williams* holding regarding public distribution was dicta, as the court found that the defendant had also made copies. *Id.*

**15.** Given the ambiguity in plaintiffs' reference to a violation of the right to "publish" and to *Playboy*, it is possible that plaintiffs are also claiming that Netcom infringed their exclusive right to publicly distribute their works. The court will address this argument *infra*.

that the storage on a defendant's system of infringing copies and retransmission to other servers is not a direct infringement by the BBS operator of the exclusive right to *reproduce* the work where such copies are uploaded by an infringing user. *Playboy* does not hold otherwise.[16]

### e. *Sega Case*

A court in this district addressed the issue of whether a BBS operator is liable for copyright infringement where it solicited subscribers to upload files containing copyrighted materials to the BBS that were available for others to download. *Sega Enterprises Ltd. v. MAPHIA*, 857 F.Supp. 679, 683 (N.D.Cal.1994). The defendant's "MAPHIA" BBS contained copies of plaintiff Sega's video game programs that were uploaded by users. *Id.* at 683. The defendant solicited the uploading of such programs and received consideration for the right to download files. *Id.* Access was given for a fee or to those purchasing the defendant's hardware device that allowed Sega video game cartridges to be copied. *Id.* at 683–84. The court granted a preliminary injunction against the defendant, finding that plaintiffs had shown a prima facie case of direct and contributory infringement. *Id.* at 687. The court found that copies were made by unknown users of the BBS when files were uploaded and downloaded. *Id.* Further, the court found that the defendant's knowledge of the infringing activities, encouragement, direction and provision of the facilities through his operation of the BBS constituted contributory infringement, even though the defendant did not know exactly when files were uploaded or downloaded. *Id.* at 686–87.

This court is not convinced that *Sega* provides support for a finding of direct infringement where copies are made on a defendant's BBS by users who upload files. Although

there is some language in *Sega* regarding *direct* infringement, it is entirely conclusory:

> Sega has established a *prima facie* case of direct copyright infringement under 17 U.S.C. § 501. Sega has established that unauthorized copies of its games *are made* when such games are uploaded to the MAPHIA bulletin board, here with the knowledge of Defendant Scherman. These games are thereby placed on the storage media of the electronic bulletin board by unknown users.

*Id.* at 686 (emphasis added). The court's reference to the "knowledge of Defendant" indicates that the court was focusing on contributory infringement, as knowledge is not an element of direct infringement. Perhaps, *Sega*'s references to direct infringement and that "copies ... are made" are to the direct liability of the "unknown users," as there can be no contributory infringement by a defendant without direct infringement by another. *See* 3 NIMMER ON COPYRIGHT § 12.04[A][3][a], at 12–89. Thus, the court finds that neither *Playboy* nor *Sega* requires finding Netcom liable for direct infringement of plaintiffs' exclusive right to reproduce their works.[17]

### f. *Public Distribution and Display?*

Plaintiffs allege that Netcom is directly liable for making *copies* of their works. *See* FAC ¶ 25. They also allege that Netcom violated their exclusive rights to publicly display copies of their works. FAC ¶¶ 44, 51. There are no allegations that Netcom violated plaintiffs' exclusive right to publicly distribute their works. However, in their discussion of direct infringement, plaintiffs insist that Netcom is liable for "maintain[ing] copies of [Erlich's] messages on its server for eleven days for access by its subscribers and 'USENET neighbors'" and they compare this case to the *Playboy* case, which dis-

---

**16.** The court further notes that *Playboy* has been much criticized. *See, e.g.,* L. Rose, NETLAW 91–92 (1995). The finding of direct infringement was perhaps influenced by the fact that there was some evidence that defendants in fact knew of the infringing nature of the works, which were digitized photographs labeled "Playboy" and "Playmate."

**17.** To the extent that *Sega* holds that BBS operators are directly liable for copyright infringement when users upload infringing works to their systems, this court respectfully disagrees with the court's holding for the reasons discussed above. Further, such a holding was dicta, as there was evidence that the defendant knew of the infringing uploads by users and, in fact, actively encouraged such activity, thus supporting the contributory infringement theory. *Id.* at 683.

cussed the right of public distribution. Opp'n at 7. Plaintiffs also argued this theory of infringement at oral argument. Tr.[18] 5:22. Because this could be an attempt to argue that Netcom has infringed plaintiffs' rights of public distribution and display, the court will address these arguments.

*Playboy* concluded that the defendant infringed the plaintiff's exclusive rights to publicly distribute and display copies of its works. 839 F.Supp. at 1556–57. The court is not entirely convinced that the mere possession of a digital copy on a BBS that is accessible to some members of the public constitutes direct infringement by the BBS operator. Such a holding suffers from the same problem of causation as the reproduction argument. Only the subscriber should be liable for causing the distribution of plaintiffs' work, as the contributing actions of the BBS provider are automatic and indiscriminate. Erlich could have posted his messages through countless access providers and the outcome would be the same: anyone with access to Usenet newsgroups would be able to read his messages. There is no logical reason to draw a line around Netcom and Klemesrud and say that they are uniquely responsible for distributing Erlich's messages. Netcom is not even the first link in the chain of distribution—Erlich had no direct relationship with Netcom but dealt solely with Klemesrud's BBS, which used Netcom to gain its Internet access. Every Usenet server has a role in the distribution, so plaintiffs' argument would create unreasonable liability. Where the BBS merely stores and passes along all messages sent by its subscribers and others, the BBS should not be seen as causing these works to be publicly distributed or displayed.

Even accepting the *Playboy* court's holding, the case is factually distinguishable. Unlike the BBS in that case, Netcom does not maintain an archive of files for its users. Thus, it cannot be said to be "suppl[ying] a product." In contrast to some of its larger competitors, Netcom does not create or control the content of the information available

to its subscribers; it merely provides *access* to the Internet, whose content is controlled by no single entity. Although the Internet consists of many different computers networked together, some of which may contain infringing files, it does not make sense to hold the operator of each computer liable as an infringer merely because his or her computer is linked to a computer with an infringing file. It would be especially inappropriate to hold liable a service that acts more like a conduit, in other words, one that does not itself keep an archive of files for more than a short duration. Finding such a service liable would involve an unreasonably broad construction of public distribution and display rights. No purpose would be served by holding liable those who have no ability to control the information to which their subscribers have access, even though they might be in some sense helping to achieve the Internet's automatic "public distribution" and the users' "public" display of files.

### g. *Conclusion*

The court is not persuaded by plaintiffs' argument that Netcom is directly liable for the copies that are made and stored on its computer. Where the infringing subscriber is clearly directly liable for the same act, it does not make sense to adopt a rule that could lead to the liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet. Such a result is unnecessary as there is already a party directly liable for causing the copies to be made. Plaintiffs occasionally claim that they only seek to hold liable a party that refuses to delete infringing files after they have been warned. However, such liability cannot be based on a theory of direct infringement, where knowledge is irrelevant. The court does not find workable a theory of infringement that would hold the entire Internet liable for activities that cannot reasonably be deterred. Billions of bits of data flow through the Internet and are necessarily stored on servers throughout the network and it is thus practically impos-

---

**18.** References to "Tr." are to the reporter's transcript of the June 23, 1995 hearing on these motions.

sible to screen out infringing bits from noninfringing bits. Because the court cannot see any meaningful distinction (without regard to knowledge) between what Netcom did and what every other Usenet server does, the court finds that Netcom cannot be held liable for direct infringement. *Cf.* IITF Report at 69 (noting uncertainty regarding whether BBS operator should be directly liable for reproduction or distribution of files uploaded by a subscriber).[19]

## 2. Contributory Infringement

■ Netcom is not free from liability just because it did not directly infringe plaintiffs' works; it may still be liable as a contributory infringer. Although there is no statutory rule of liability for infringement committed by others,

> [t]he absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringement on certain parties who have not themselves engaged in the infringing activity. For vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another.

*Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 435, 104 S.Ct. 774, 785, 78 L.Ed.2d 574 (1984) (footnote omitted). Liability for participation in the infringement will be established where the defendant, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Gershwin Publishing Corp. v. Columbia Artists*

*Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971).

### a. *Knowledge of Infringing Activity*

■ Plaintiffs insist that Netcom knew that Erlich was infringing their copyrights at least after receiving notice from plaintiffs' counsel indicating that Erlich had posted copies of their works onto a.r.s. through Netcom's system. Despite this knowledge, Netcom continued to allow Erlich to post messages to a.r.s. and left the allegedly infringing messages on its system so that Netcom's subscribers and other Usenet servers could access them. Netcom argues that it did not possess the necessary type of knowledge because (1) it did not know of Erlich's planned infringing activities when it agreed to lease its facilities to Klemesrud, (2) it did not know that Erlich would infringe prior to any of his postings, (3) it is unable to screen out infringing postings before they are made, and (4) its knowledge of the infringing nature of Erlich's postings was too equivocal given the difficulty in assessing whether the registrations were valid and whether Erlich's use was fair. The court will address these arguments in turn.

■ Netcom cites cases holding that there is no contributory infringement by the lessors of premises that are later used for infringement unless the lessor had knowledge of the intended use at the time of the signing of the lease. *See, e.g. Deutsch v. Arnold,* 98 F.2d 686, 688 (2d Cir.1938).[20] The contribution to the infringement by the defendant in *Deutsch* was merely to lease use of the premises to the infringer. Here, Netcom not only leases space but also serves as an access provider, which includes the storage and transmission of information necessary to fa-

---

**19.** Despite that uncertainty, the IITF Report recommends a strict liability paradigm for BBS operators. *See* IITF Report at 122–24. It recommends that Congress not exempt on-line service providers from strict liability because this would prematurely deprive the system of an incentive to get providers to reduce the damage to copyright holders by reducing the chances that users will infringe by educating them, requiring indemnification, purchasing insurance, and, where efficient, developing technological solutions to screening out infringement. Denying strict liability in many cases would leave copyright owners without an adequate remedy since direct infringers may act anonymously or pseudonymously or may not have the resources to pay a judgment. *Id.; see also* Hardy, *supra.*

**20.** Adopting such a rule would relieve a BBS of liability for failing to take steps to remove infringing works from its system even after being handed a court's order finding infringement. This would be undesirable and is inconsistent with Netcom's counsel's admission that Netcom would have an obligation to act in such circumstances. Tr. 35:25; *see also* Tr. 42:18–42:20.

cilitate Erlich's postings to a.r.s. Unlike a landlord, Netcom retains some control over the use of its system. *See infra* part I.B.3.a. Thus, the relevant time frame for knowledge is not when Netcom entered into an agreement with Klemesrud. It should be when Netcom provided its services to allow Erlich to infringe plaintiffs' copyrights. *Cf. Screen Gems–Columbia Music, Inc. v. Mark–Fi Records, Inc.,* 256 F.Supp. 399, 403 (S.D.N.Y. 1966) (analyzing knowledge at time that defendant rendered its particular service). It is undisputed that Netcom did not know that Erlich was infringing before it received notice from plaintiffs. Netcom points out that the alleged instances of infringement occurring on Netcom's system all happened prior to December 29, 1994, the date on which Netcom first received notice of plaintiffs' infringement claim against Erlich. *See* Pisani Feb. 8, 1995 Decl., ¶ 6 & Exs. (showing latest posting made on December 29, 1994); McShane Feb. 8, 1995 Decl.; FAC ¶¶ 36–38 & Ex. I. Thus, there is no question of fact as to whether Netcom knew or should have known of Erlich's infringing activities that occurred more than 11 days before receipt of the December 28, 1994 letter.

However, the evidence reveals a question of fact as to whether Netcom knew or should have known that Erlich had infringed plaintiffs' copyrights following receipt of plaintiffs' letter. Because Netcom was arguably participating in Erlich's public distribution of plaintiffs' works, there is a genuine issue as to whether Netcom knew of any infringement by Erlich before it was too late to do anything about it. If plaintiffs can prove the knowledge element, Netcom will be liable for contributory infringement since its failure to simply cancel Erlich's infringing message and thereby stop an infringing copy from being distributed worldwide constitutes substantial participation in Erlich's public distribution of the message. *Cf.* R.T. Nimmer, THE LAW OF COMPUTER TECHNOLOGY ¶ 15.11B, at S15–42 (2d ed. 1994) (opining that "where information service is less directly involved in the enterprise of creating unauthorized copies, a finding of contributory infringement is not likely").

Netcom argues that its knowledge after receiving notice of Erlich's alleged infringing activities was too equivocal given the difficulty in assessing whether registrations are valid and whether use is fair. Although a mere unsupported allegation of infringement by a copyright owner may not automatically put a defendant on notice of infringing activity, Netcom's position that liability must be unequivocal is unsupportable. While perhaps the typical infringing activities of BBSs will involve copying software, where BBS operators are better equipped to judge infringement, the fact that this involves written works should not distinguish it. Where works contain copyright notices within them, as here, it is difficult to argue that a defendant did not know that the works were copyrighted. To require proof of valid registrations would be impractical and would perhaps take too long to verify, making it impossible for a copyright holder to protect his or her works in some cases, as works are automatically deleted less than two weeks after they are posted. The court is more persuaded by the argument that it is beyond the ability of a BBS operator to quickly and fairly determine when a use is not infringement where there is at least a colorable claim of fair use. Where a BBS operator cannot reasonably verify a claim of infringement, either because of a possible fair use defense, the lack of copyright notices on the copies, or the copyright holder's failure to provide the necessary documentation to show that there is a likely infringement, the operator's lack of knowledge will be found reasonable and there will be no liability for contributory infringement for allowing the continued distribution of the works on its system.

Since Netcom was given notice of an infringement claim before Erlich had completed his infringing activity, there may be a question of fact as to whether Netcom knew or should have known that such activities were infringing. Given the context of a dispute between a former minister and a church he is criticizing, Netcom may be able to show that its lack of knowledge that Erlich was infringing was reasonable. However, Netcom admits that it did not even look at the postings once given notice and that had it looked at the copyright notice and state-

ments regarding authorship, it would have triggered an investigation into whether there was infringement. Kobrin June 7, 1995 Decl., Ex. H, Hoffman Depo. At 125–128. These facts are sufficient to raise a question as to Netcom's knowledge once it received a letter from plaintiffs on December 29, 1994.[21]

#### b. *Substantial Participation*

■ Where a defendant has knowledge of the primary infringer's infringing activities, it will be liable if it "induces, causes or materially contributes to the infringing conduct of" the primary infringer. *Gershwin Publishing,* 443 F.2d at 1162. Such participation must be substantial. *Apple Computer, Inc. v. Microsoft Corp.,* 821 F.Supp. 616, 625 (N.D.Cal.1993), *aff'd,* 35 F.3d 1435 (9th Cir. 1994); *Demetriades v. Kaufmann,* 690 F.Supp. 289, 294 (S.D.N.Y.1988).

■ Providing a service that allows for the automatic distribution of all Usenet postings, infringing and noninfringing, goes well beyond renting a premises to an infringer. *See Fonovisa, Inc. v. Cherry Auction, Inc.,* 847 F.Supp. 1492, 1496 (E.D.Cal.1994) (finding that renting space at swap meet to known bootleggers not "substantial participation" in the infringers' activities). It is more akin to the radio stations that were found liable for rebroadcasting an infringing broadcast. *See, e.g., Select Theatres Corp. v. Ronzoni Macaroni Corp.,* 59 U.S.P.Q. 288, 291 (S.D.N.Y.1943). Netcom allows Erlich's infringing messages to remain on its system and be further distributed to other Usenet servers worldwide. It does not completely relinquish control over how its system is used, unlike a landlord. Thus, it is fair, assuming Netcom is able to take simple measures to prevent further damage to plaintiffs' copyrighted works, to hold Netcom liable for contributory infringement where Netcom has knowledge of Erlich's infringing postings yet

continues to aid in the accomplishment of Erlich's purpose of publicly distributing the postings. Accordingly, plaintiffs do raise a genuine issue of material fact as to their theory of contributory infringement as to the postings made after Netcom was on notice of plaintiffs' infringement claim.

### 3. Vicarious Liability

■ Even if plaintiffs cannot prove that Netcom is contributorily liable for its participation in the infringing activity, it may still seek to prove vicarious infringement based on Netcom's relationship to Erlich. A defendant is liable for vicarious liability for the actions of a primary infringer where the defendant (1) has the right and ability to control the infringer's acts and (2) receives a direct financial benefit from the infringement. *See Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 306 (2d Cir.1963). Unlike contributory infringement, knowledge is not an element of vicarious liability. 3 NIMMER ON COPYRIGHT § 12.04[A][1], at 12–70.

#### a. *Right and Ability To Control*

■ The first element of vicarious liability will be met if plaintiffs can show that Netcom has the right and ability to supervise the conduct of its subscribers. Netcom argues that it does not have the right to control its users' postings before they occur. Plaintiffs dispute this and argue that Netcom's terms and conditions, to which its subscribers[22] must agree, specify that Netcom reserves the right to take remedial action against subscribers. *See, e.g.,* Francis Depo. at 124–126. Plaintiffs argue that under "netiquette," the informal rules and customs that have developed on the Internet, violation of copyrights by a user is unacceptable and the access provider has a duty take measures to prevent this; where the immediate service

---

**21.** The court does not see the relevance of plaintiffs' argument that Netcom's failure to investigate their claims of infringement or take actions against Erlich was a departure from Netcom's normal procedure. A policy and practice of acting to stop postings where there is inadequate knowledge of infringement in no way creates a higher standard of care under the Copyright Act as to subsequent claims of user infringement.

**22.** In this case, Netcom is even further removed from Erlich's activities. Erlich was in a contractual relationship only with Klemesrud. Netcom thus dealt directly only with Klemesrud. However, it is not crucial that Erlich does not obtain access directly through Netcom. The issue is Netcom's right and ability to control the use of its system, which it can do indirectly by controlling Klemesrud's use.

provider fails, the next service provider up the transmission stream must act. *See* Castleman Decl. ¶¶ 32–43. Further evidence of Netcom's right to restrict infringing activity is its prohibition of copyright infringement and its requirement that its subscribers indemnify it for any damage to third parties. *See* Kobrin May 5, 1995 Decl., Ex. G. Plaintiffs have thus raised a question of fact as to Netcom's right to control Erlich's use of its services.

Netcom argues that it could not possibly screen messages before they are posted given the speed and volume of the data that goes through its system. Netcom further argues that it has never exercised control over the content of its users' postings. Plaintiffs' expert opines otherwise, stating that with an easy software modification Netcom could identify postings that contain particular words or come from particular individuals. Castleman Decl. ¶¶ 39–43; *see also* Francis Depo. at 262–63; Hoffman Depo. at 173–74, 178.[23] Plaintiffs further dispute Netcom's claim that it could not limit Erlich's access to Usenet without kicking off all 500 subscribers of Klemesrud's BBS. As evidence that Netcom has in fact exercised its ability to police its users' conduct, plaintiffs cite evidence that Netcom has acted to suspend subscribers' accounts on over one thousand occasions. *See* Ex. J (listing suspensions of subscribers by Netcom for commercial advertising, posting obscene materials, and off-topic postings). Further evidence shows that Netcom can delete specific postings. *See* Tr. 9:16. Whether such sanctions occurred before or after the abusive conduct is not material to whether Netcom can exercise control. The court thus finds that plaintiffs have raised a genuine issue of fact as to whether Netcom has the right and ability to exercise control over the activities of its subscribers, and of Erlich in particular.

### b. *Direct Financial Benefit*

■ Plaintiffs must further prove that Netcom receives a direct financial benefit from the infringing activities of its users. For example, a landlord who has the right and ability to supervise the tenant's activities is vicariously liable for the infringements of the tenant where the rental amount is proportional to the proceeds of the tenant's sales. *Shapiro, Bernstein,* 316 F.2d at 306. However, where a defendant rents space or services on a fixed rental fee that does not depend on the nature of the activity of the lessee, courts usually find no vicarious liability because there is no direct financial benefit from the infringement. *See, e.g., Roy Export Co. v. Trustees of Columbia University,* 344 F.Supp. 1350, 1353 (S.D.N.Y.1972) (finding no vicarious liability of university because no financial benefit from allowing screening of bootlegged films); *Fonovisa,* 847 F.Supp. at 1496 (finding swap meet operators did not financially benefit from fixed fee); *see also* Kelly Tickle, Comment, *The Vicarious Liability of Electronic Bulletin Board Operators for the Copyright Infringement Occurring on Their Bulletin Boards,* 80 Iowa L.Rev. 391, 415 (1995) (arguing that BBS operators "lease cyberspace" and should thus be treated like landlords, who are not liable for infringement that occurs on their premises).

Plaintiffs argue that courts will find a financial benefit despite fixed fees. In *Polygram International Publishing, Inc. v. Nevada/TIG, Inc.,* 855 F.Supp. 1314, 1330–33 (D.Mass.1994), the court found a trade show organizer vicariously liable for the infringing performance of an exhibitor because, although the infringement did not affect the fixed rental fee received by the organizers, the organizers benefitted from the performances, which helped make the show a financial success. *But see Artists Music, Inc. v. Reed Publishing, Inc.,* 31 U.S.P.Q.2d 1623, 1994 WL 191643, at *6 (S.D.N.Y.1994) (finding no vicarious liability for trade show organizers where revenues not increased because of infringing music performed by exhibitors). Plaintiffs cite two other cases where, despite fixed fees, defendants received financial benefits from allowing groups to perform infringing works over the radio without having to get an ASCAP license, which minimized the defendants' expenses. *See Boz Scaggs Music v. KND Corp,* 491 F.Supp. 908, 913 (D.Conn.1980); *Realsongs v. Gulf Broadcast-*

---

**23.** However, plaintiffs submit no evidence indicating Netcom, or anyone, could design software that could determine whether a posting is infringing.

*ing Corp.,* 824 F.Supp. 89, 92 (M.D.La.1993). Plaintiffs' cases are factually distinguishable. Plaintiffs cannot provide any evidence of a direct financial benefit received by Netcom from Erlich's infringing postings. Unlike *Shapiro, Bernstein,* and like *Fonovisa,* Netcom receives a fixed fee. There is no evidence that infringement by Erlich, or any other user of Netcom's services, in any way enhances the value of Netcom's services to subscribers or attracts new subscribers. Plaintiffs argue, however, that Netcom somehow derives a benefit from its purported "policy of refusing to take enforcement actions against its subscribers and others who transmit infringing messages over its computer networks." Opp'n at 18. Plaintiffs point to Netcom's advertisements that, compared to competitors like CompuServe and America Online, Netcom provides easy, regulation-free Internet access. Plaintiffs assert that Netcom's policy attracts copyright infringers to its system, resulting in a direct financial benefit. The court is not convinced that such an argument, if true, would constitute a direct financial benefit to Netcom from *Erlich's* infringing activities. *See Fonovisa,* 847 F.Supp. at 1496 (finding no direct financial benefit despite argument that lessees included many vendors selling counterfeit goods and that clientele sought "bargain basement prices"). Further, plaintiffs' argument is not supported by probative evidence. The only "evidence" plaintiffs cite for their supposition is the declaration of their counsel, Elliot Abelson, who states that

> [o]n April 7, 1995, in a conversation regarding Netcom's position related to this case, Randolf Rice, attorney for Netcom, informed me that Netcom's executives are happy about the publicity it is receiving in the press as a result of this case. Mr. Rice also told me that Netcom was concerned that it would lose business if it took action against Erlich or Klemesrud in connection with Erlich's infringements.

Abelson Decl. ¶ 2. Netcom objects to this declaration as hearsay and as inadmissible evidence of statements made in compromise negotiations. Fed.R.Ev. 801, 408. Whether or not this declaration is admissible, it does not support plaintiffs' argument that Netcom either has a policy of not enforcing violations of copyright laws by its subscribers or, assuming such a policy exists, that Netcom's policy directly financially benefits Netcom, such as by attracting new subscribers. Because plaintiffs have failed to raise a question of fact on this vital element, their claim of vicarious liability fails. *See Roy Export,* 344 F.Supp. at 1353.

### 4. First Amendment Argument

■ Netcom argues that plaintiffs' theory of liability contravenes the first amendment, as it would chill the use of the Internet because every access provider or user would be subject to liability when a user posts an infringing work to a Usenet newsgroup. While the court agrees that an overbroad *injunction* might implicate the First Amendment, *see In re Capital Cities/ABC, Inc.,* 918 F.2d 140, 144 (11th Cir.1990),[24] imposing *liability* for infringement where it is otherwise appropriate does not necessarily raise a First Amendment issue. The copyright concepts of the idea/expression dichotomy and the fair use defense balance the important First Amendment rights with the constitutional authority for "promot[ing] the progress of science and useful arts," U.S. CONST. art. I, § 8, cl. 8; 1 NIMMER ON COPYRIGHT § 1.10[B], at 1–71 to –83. Netcom argues that liability here would force Usenet servers to perform the impossible—screening all the information that comes through their systems. However, the court is not convinced that Usenet servers are directly liable for causing a copy to be made, and absent evidence of knowledge and participation or control and direct profit, they will not be contributorily or vicariously liable. If Usenet servers were responsible for screening all messages coming through their systems, this could have a serious chilling effect on what some say may turn out to be the best public forum for free speech yet

24. For example, plaintiffs' demand that the court order Netcom to terminate Klemesrud's BBS's access to the Internet, thus depriving all 500 of his subscribers, would be overbroad, as it would unnecessarily keep hundreds of users, against whom there are no allegations of copyright infringement, from accessing a means of speech. The overbroadness is even more evident if, as plaintiffs contend, there is a way to restrict only Erlich's access to a.r.s.

devised. *See* Jerry Berman & Daniel J. Weitzner, *Abundance and User Control: Renewing the Democratic Heart of the First Amendment in the Age of Interactive Media,* 104 YALE L.J. 1619, 1624 (1995) (praising decentralized networks for opening access to all with no entity stifling independent sources of speech); Rose, *supra,* at 4.[25] Finally, Netcom admits that its First Amendment argument is merely a consideration in the fair use argument, which the court will now address. *See* Reply at 24.

### 5. Fair Use Defense

■■■ Assuming plaintiffs can prove a violation of one of the exclusive rights guaranteed in section 106, there is no infringement if the defendant's use is fair under section 108. The proper focus here is on whether Netcom's actions qualify as fair use, not on whether Erlich himself engaged in fair use; the court has already found that Erlich was not likely entitled to his own fair use defense, as his postings contained large portions of plaintiffs' published and unpublished works quoted verbatim with little added commentary.

Although the author has the exclusive rights to reproduce, publicly distribute, and publicly display a copyrighted work under section 106, these rights are limited by the defense of "fair use." 17 U.S.C. § 107. The defense "permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.,* — U.S. —, —, 114 S.Ct. 1164, 1170, 127 L.Ed.2d 500 (1994) (citation omitted). Congress has set out four nonexclusive factors to be considered in determining the availability of the fair use defense:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The fair use doctrine calls for a case-by-case analysis. *Campbell,* — U.S. at —, 114 S.Ct. at 1170. All of the factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Id.* at — – —, 114 S.Ct. at 1170–71.

### a. *First Factor: Purpose and Character of the Use*

The first statutory factor looks to the purpose and character of the defendant's use. Netcom's use of plaintiffs' works is to carry out its commercial function as an Internet access provider. Such a use, regardless of

---

**25.** Netcom additionally argues that plaintiffs' theory of liability would have a chilling effect on users, who would be liable for merely browsing infringing works. Browsing technically causes an infringing copy of the digital information to be made in the screen memory. *MAI* holds that such a copy is fixed even when information is temporarily placed in RAM, such as the screen RAM. The temporary copying involved in browsing is only necessary because humans cannot otherwise perceive digital information. It is the functional equivalent of reading, which does not implicate the copyright laws and may be done by anyone in a library without the permission of the copyright owner. However, it can be argued that the effects of digital browsing are different because millions can browse a single copy of a work in cyberspace, while only one can read a library's copy at a time.

Absent a commercial or profit-depriving use, digital browsing is probably a fair use; there could hardly be a market for licensing the temporary copying of digital works onto computer screens to allow browsing. Unless such a use is commercial, such as where someone reads a copyrighted work online and therefore decides not to purchase a copy from the copyright owner, fair use is likely. Until reading a work online becomes as easy and convenient as reading a paperback, copyright owners do not have much to fear from digital browsing and there will not likely be much market effect.

Additionally, unless a user has reason to know, such as from the title of a message, that the message contains copyrighted materials, the browser will be protected by the innocent infringer doctrine, which allows the court to award no damages in appropriate circumstances. In any event, users should hardly worry about a finding of direct infringement; it seems highly unlikely from a practical matter that a copyright owner could prove such infringement or would want to sue such an individual.

the underlying uses made by Netcom's subscribers, is clearly commercial. Netcom's use, though commercial, also benefits the public in allowing for the functioning of the Internet and the dissemination of other creative works, a goal of the Copyright Act. *See Sega v. Accolade,* 977 F.2d 1510, 1523 (9th Cir.1992) (holding that intermediate copying to accomplish reverse engineering of software fair use despite commercial nature of activity; considering public benefit of use). The *Campbell* Court emphasized that a commercial use does not dictate against a finding of fair use, as most of the uses listed in the statute are "generally conducted for profit in this country." —— U.S. at ——, 114 S.Ct. at 1174. Although Netcom gains financially from its distribution of messages to the Internet, its financial incentive is unrelated to the infringing activity and the defendant receives no direct financial benefit from the acts of infringement. Therefore, the commercial nature of the defendant's activity should not be dispositive. Moreover, there is no easy way for a defendant like Netcom to secure a license for carrying every possible type of copyrighted work onto the Internet. Thus, it should not be seen as "profit[ing] from the exploitation of the copyrighted work without paying the customary prices." *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985). It is undisputed that, unlike the defendants in *Playboy* and *Sega,* Netcom does not directly gain anything from the content of the information available to its subscribers on the Internet. *See supra* part I.B.3.b. Because it does not itself provide the files or solicit infringing works, its purpose is different from that of the defendants in *Playboy* and *Sega.* Because Netcom's use of copyrighted materials served a completely different function than that of the plaintiffs, this factor weighs in Netcom's favor, *see Hustler Magazine, Inc. v. Moral Majority, Inc.,* 606 F.Supp. 1526, 1535 (C.D.Cal.1985), *aff'd,* 796 F.2d 1148 (9th Cir. 1986), notwithstanding the otherwise commercial nature of Netcom's use.

### b. *Second Factor: Nature of the Copyrighted Work*

The second factor focuses on two different aspects of the copyrighted work: whether it is published or unpublished and whether it is informational or creative.[26] Plaintiffs rely on the fact that some of the works transmitted by Netcom were unpublished and some were arguably highly creative and original. However, because Netcom's use of the works was merely to facilitate their posting to the Usenet, which is an entirely different purpose than plaintiffs' use (or, for that matter, Erlich's use), the precise nature of those works is not important to the fair use determination. *See Campbell,* —— U.S. at ——, 114 S.Ct. at 1175 (finding creative nature of work copied irrelevant where copying for purposes of parody); *Hustler Magazine,* 606 F.Supp. at 1537; 3 NIMMER ON COPYRIGHT § 13.05[A][2][a], at 13–177 ("It is sometimes necessary, in calibrating the fair use defense, to advert to the defendant's usage simultaneously with the nature of the plaintiff's work.").

### c. *Third Factor: Amount and Substantiality of the Portion Used*

The third factor concerns both the percentage of the original work that was copied and whether that portion constitutes the "heart" of the copyrighted work. *Harper & Row,* 471 U.S. at 564–65, 105 S.Ct. at 2232–33. Generally, no more of a work may be copied than is necessary for the particular use. *See Supermarket of Homes v. San Fernando Valley Board of Realtors,* 786 F.2d 1400, 1409 (9th Cir.1986). The copying of an entire work will ordinarily militate against a finding of fair use, although this is not a per se rule. *Sony,* 464 U.S. at 449–450, 104 S.Ct. at 792–793.

Plaintiffs have shown that Erlich's postings copied substantial amounts of the originals or, in some cases, the entire works. Netcom, of course, made available to the

---

**26.** A recent report noted that a third aspect of the nature of the work may be relevant: whether it is in digital or analog form. IITF Report at 78. Although the copyright laws were developed before digital works existed, they have certainly evolved to include such works, and this court can see no reason why works should deserve less protection because they are in digital form, especially where, as here, they were not put in such form by plaintiffs.

Usenet exactly what was posted by Erlich. As the court found in *Sony,* the mere fact that all of a work is copied is not determinative of the fair use question, where such total copying is essential given the purpose of the copying. *Id.* (allowing total copying in context of time-shifting copyrighted television shows by home viewers). For example, where total copying was necessary to carry out the defendants' beneficial purpose of reverse engineering software to get at the ideas found in the source code, the court found fair use. *Sega v. Accolade,* 977 F.2d at 1526–27. Here, Netcom copied no more of plaintiffs' works than necessary to function as a Usenet server. Like the defendant in *Sega v. Accolade,* Netcom had no practical alternative way to carry out its socially useful purpose; a Usenet server must copy all files, since the prescreening of postings for potential copyright infringement is not feasible. 977 F.2d at 1526. Accordingly, this factor should not defeat an otherwise valid defense.

d. *Fourth Factor: Effect of the Use upon the Potential Market for the Work*

The fourth and final statutory factor concerns "the extent of market harm caused by the particular actions of the alleged infringer" and " 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original." *Campbell,* —— U.S. at ——, 114 S.Ct. at 1177 (quoting 3 NIMMER ON COPYRIGHT § 13.05[A][4] ) (remanding for consideration of this factor). Although the results of all four factors must be weighed together, *id.* at ——, 114 S.Ct. at 1171, the fourth factor is the most important consideration, 3 NIMMER ON COPYRIGHT § 13.05[A][4], at 13–188 to –189 (citing *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233), 13–207 (observing that fourth factor explains results in recent Supreme Court cases).

Netcom argues that there is no evidence that making accessible plaintiffs' works, which consist of religious scriptures and policy letters, will harm the market for these works by preventing someone from participating in the Scientology religion because they can view the works on the Internet

instead. Further, Netcom notes that the relevant question is whether the postings fulfill the demand of an individual who seeks to follow the religion's teachings, and not whether they suppress the desire of an individual who is affected by the criticism posted by Erlich. Netcom argues that the court must focus on the "normal market" for the copyrighted work, which in this case is through a Scientology-based organization. Plaintiffs respond that the Internet's extremely widespread distribution—where more than 25 million people worldwide have access—multiplies the effects of market substitution. In support of its motion for a preliminary injunction against Erlich, plaintiffs submitted declarations regarding the potential effect of making the Church's secret scriptures available over the Internet. Plaintiffs point out that, although the Church currently faces no competition, groups in the past have used stolen copies of the Church's scriptures in charging for Scientology-like religious training. *See, e.g., Bridge Publications, Inc. v. Vien,* 827 F.Supp. 629, 633–34 (S.D.Cal.1993); *Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1078–79 (9th Cir.1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987). This evidence raises a genuine issue as to the possibility that Erlich's postings, made available over the Internet by Netcom, could hurt the market for plaintiffs' works.

e. *Equitable Balancing*

In balancing the various factors, the court finds that there is a question of fact as to whether there is a valid fair use defense. Netcom has not justified its copying plaintiffs' works to the extent necessary to establish entitlement to summary judgment in light of evidence that it knew that Erlich's use was infringing and had the ability to prevent its further distribution. While copying all or most of a work will often preclude fair use, courts have recognized the fair use defense where the purpose of the use is beneficial to society, complete copying is necessary given the type of use, the purpose of the use is completely different than the purpose of the original, and there is no evidence that the use will significantly harm the market for the original. This case is distinguishable from those cases recognizing fair use

despite total copying. In *Sony*, the home viewers' use was not commercial and the viewers were allowed to watch the entire shows for free. In *Sega v. Accolade*, the complete copying was necessitated to access the unprotectable idea in the original. Here, plaintiffs never gave either Erlich or Netcom permission to view or copy their works. Netcom's use has some commercial aspects. Further, Netcom's copying is not for the purpose of getting to the unprotected idea behind plaintiffs' works. Although plaintiffs may ultimately lose on their infringement claims if, among other things, they cannot prove that posting their copyrighted works will harm the market for these works, *see Religious Technology Center v. Lerma*, 897 F.Supp. 260, 263 (E.D.Va.1995) (finding fair use defense exists where no separate market for works because Scientologists cannot effectively use them without the Church's supervision); *Religious Technology Center v. F.A.C.T.NET, Inc.*, 901 F.Supp. 1519, 1522–26 (D.Colo. September 15, 1995) (finding no showing of a potential effect on the market for plaintiffs' works), fair use presents a factual question on which plaintiffs have at least raised a genuine issue of fact. Accordingly, the court does not find that Netcom's use was fair as a matter of law.

### C. Conclusion

The court finds that plaintiffs have raised a genuine issue of fact regarding whether Netcom should have known that Erlich was infringing their copyrights after receiving a letter from plaintiffs, whether Netcom substantially participated in the infringement, and whether Netcom has a valid fair use defense. Accordingly, Netcom is not entitled to summary judgment on plaintiffs' claim of contributory copyright infringement. However, plaintiffs' claims of direct and vicarious infringement fail.

## II. KLEMESRUD'S MOTION FOR JUDGMENT ON THE PLEADINGS

### A. Standards for Judgment on the Pleadings

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is directed at the legal sufficiency of a party's allegations. A judgment on the pleadings is proper when there are no issues of material fact, and the moving party is entitled to judgment as a matter of law. *General Conference Corp. v. Seventh Day Adventist Church*, 887 F.2d 228, 230 (9th Cir.1989), *cert. denied*, 493 U.S. 1079, 110 S.Ct. 1134, 107 L.Ed.2d 1039 (1990); *Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir.1989). In ruling on a motion for judgment on the pleadings, district courts must accept all material allegations of fact alleged in the complaint as true, and resolve all doubts in favor of the nonmoving party. *Id.* The court need not accept as true conclusory allegations or legal characterizations. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981). Materials submitted with the complaint may be considered. *Hal Roach Studios*, 896 F.2d at 1555. All affirmative defenses must clearly appear on the face of the complaint. *McCalden v. California Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir.1990).

### B. Copyright Infringement

#### 1. Direct Infringement

■ First, plaintiffs allege that Klemesrud directly infringed their copyrights by "reproduc[ing] and publish[ing] plaintiffs' works." FAC ¶ 35. The complaint alleges that "Erlich ... caused copies of [plaintiffs' works] to be published, without authorization, on the BBS computer maintained by Klemesrud" and that "Klemesrud's BBS computer, after receiving and storing for some period of time the copies of the Works sent to it from Erlich, created additional copies of the works and sent these copies to Netcom's computer." FAC ¶ 34. The allegations against Klemesrud fail for the same reason the court found that Netcom was entitled to judgment as a matter of law on the direct infringement claim. There are no allegations that Klemesrud took any affirmative steps to cause the copies to be made. The allegations, in fact, merely say that "Erlich ... caused" the copies to be made and that Klemesrud's *computer*, not Klemesrud himself, created additional copies. There are

no allegations in the complaint to overcome the missing volitional or causal elements necessary to hold a BBS operator directly liable for copying that is automatic and caused by a subscriber. *See supra* part I.B.1.

## 2. Contributory Infringement

■ Second, the complaint alleges that Klemesrud is contributorily liable. FAC ¶ 35. It further alleges that plaintiffs repeatedly objected to Klemesrud's actions and informed him that Erlich's (and his) actions constituted infringement. FAC ¶ 36. A letter attached to the complaint indicates that such notice was first sent to Klemesrud on December 30, 1994. FAC, Ex. I. Despite the warnings, Klemesrud allegedly refused to assist plaintiffs in compelling Erlich to stop his postings and refused to stop receiving, copying, transmitting and publishing the postings. FAC ¶ 38. To state a claim for contributory infringement, plaintiffs must allege that Klemesrud knew or should have known of Erlich's infringing actions at the time they occurred and yet substantially participated by "induc[ing], caus[ing] or materially contribut[ing] to the infringing conduct" of Erlich. *Gershwin,* 443 F.2d at 1162. For the reasons discussed in connection with Netcom's motion, the court finds plaintiffs' pleadings sufficient to raise an issue of contributory infringement.

## 3. Vicarious Liability

■ The third theory of liability argued by plaintiffs, vicarious liability, is not specifically mentioned in the complaint. Nonetheless, this theory fails as a matter of law because there are insufficient factual allegations to support it. Plaintiffs must show that Klemesrud had the right and ability to control Erlich's activities and that Klemesrud had a direct financial interest in Erlich's infringement. *Shapiro, Bernstein,* 316 F.2d at 306. A letter from Klemesrud to plaintiffs' counsel states that Klemesrud would comply with plaintiffs' request to take actions against Erlich by deleting the infringing postings from his BBS if plaintiffs mailed him the original copyrighted work and he found that they matched the allegedly infringing posting. FAC, Ex. J. Plaintiffs

argue that this letter indicates Klemesrud's ability and right to control Erlich's activities on his BBS. The court finds that this letter, construed in the light most favorable to plaintiffs, raises a question as to whether plaintiffs can show that Klemesrud, in the operation of his BBS, could control Erlich's activities, such as by deleting infringing postings. However, plaintiffs' failure to allege a financial benefit is fatal to their claim for vicarious liability.

The complaint alleges that Klemesrud is in the business of operating a BBS for subscribers for a fee. The complaint does not say how the fee is collected, but there are no allegations that Klemesrud's fee, or any other direct financial benefit received by Klemesrud, varies in any way with the content of Erlich's postings. Nothing in or attached to the complaint states that Klemesrud in any way profits from allowing Erlich to infringe copyrights. Plaintiffs are given 30 days leave in which to amend to cure this pleadings deficiency if they can do so in good faith.

## III. PRELIMINARY INJUNCTION AGAINST NETCOM AND KLEMESRUD

### A. Legal Standards for a Preliminary Injunction

■ A party seeking a preliminary injunction may establish its entitlement to equitable relief by showing either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) serious questions as to these matters and the balance of hardships tipping sharply in the movant's favor. *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir.1987). These two tests are not separate, but represent a "continuum" of equitable discretion whereby the greater the relative hardship to the moving party, the less probability of success need be shown. *Regents of University of California v. American Broadcasting Cos.,* 747 F.2d 511, 515 (9th Cir.1984). The primary purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980).

## B. Likelihood of Success

The court finds that plaintiffs have not met their burden of showing a likelihood of success on the merits as to either Netcom or Klemesrud. The only viable theory of infringement is contributory infringement, and there is little evidence that Netcom or Klemesrud knew or should have known that Erlich was engaged in copyright infringement of plaintiffs' works and was not entitled to a fair use defense, especially as they did not receive notice of the alleged infringement until after all but one of the postings were completed. Further, their participation in the infringement was not substantial. Accordingly, plaintiffs will not likely prevail on their claims.

## C. Irreparable Injury

The court will presume irreparable harm for the copyright claim where plaintiffs have shown a likelihood of success on their claims of infringement. *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1174 (9th Cir.1989). Here, however, plaintiffs have not made an adequate showing of likelihood of success. More importantly, plaintiffs have not shown that the current preliminary injunction prohibiting Erlich from infringing plaintiffs' copyrights will not be sufficient to avoid any harm to plaintiffs' intellectual property rights.

## D. First Amendment Concerns

There is a strong presumption against any injunction that could act as a "prior restraint" on free speech, citing *CBS, Inc. v. Davis*, — U.S. —, — – —, 114 S.Ct. 912, 913–14, 127 L.Ed.2d 358 (1994) (Justice Blackmun, as Circuit Justice, staying a preliminary injunction prohibiting CBS from airing footage of inside of meat packing plant). Because plaintiffs seek injunctive relief that is broader than necessary to prevent Erlich from committing copyright infringement, there is a valid First Amendment question raised here. Netcom and Klemesrud play a vital role in the speech of their users. Requiring them to prescreen postings for possible infringement would chill their users' speech. *Cf. In re Capital Cities/ABC, Inc*, 918 F.2d at 144.

## E. Conclusion

Plaintiffs have not shown a likelihood of success on the merits of their copyright claims nor irreparable harm absent an injunction against defendants Netcom and Klemesrud. Accordingly, plaintiffs are not entitled to a preliminary injunction.

## IV. ORDER

The court denies Netcom's motion for summary judgment and Klemesrud's motion for judgment on the pleadings, as a triable issue of fact exists on the claim of contributory infringement. The court also gives plaintiffs 30 days leave in which to amend to state a claim for vicarious liability against defendant Klemesrud, if they can do so in good faith. Plaintiffs' application for a preliminary injunction against defendants Netcom and Klemesrud is denied.

The parties shall appear for a case management conference at 10:30 a.m. on Friday, January 19, 1996. The deadline for completing required disclosures is January 5, 1996. The joint case management conference statement must be filed by January 12, 1996.