*1033
 

 OPINION AND ORDER
 

 SCHEINDLIN, District Judge:
 

 Plaintiff, Playboy Enterprises, Inc. (“PEI”), has moved for a finding of contempt against Defendant, Tattilo Editrice, S.p.A. (“Tattilo”). PEI alleges that by operating an Internet site from Italy under the PLAY-MEN label, Tattilo has violated a judgment dated June 26, 1981, enjoining it from publishing, printing, distributing or selling in the United States an English language male sophisticate magazine under the name “PLAY-MEN” (“Injunction”).
 

 
 *1034
 
 For the reasons enunciated below, the motion is granted. Tattilo must, within two weeks of the date of this Order: (1) either shut down its Internet site completely or refrain from accepting any new subscriptions from customers residing in the United States; (2) invalidate the user names and passwords to the Internet site previously purchased by United States customers; (3) refund to its United States customers the remaining unused portions of their subscriptions; (4) remit to PEI all gross profits earned from subscriptions to its PLAYMEN Pro Internet service by customers in the United States; (5) remit to PEI all gross profits earned from the sale of goods and services advertised on its PLAYMEN Internet service to customers in the United States; (6) revise its Internet site to indicate that all subscription requests from potential United States customers will be denied; and (7) remit to PEI its costs and attorney’s fees incurred in making this application. If these conditions have not been met within the stated two-week period, Tattilo shall pay to PEI a fine of $1,000 per day until it complies with this Order.
 

 I.
 
 Facts
 

 In 1967, Tattilo began publishing a male sophisticate magazine in Italy under the name PLAYMEN. Although the magazine carried an English title, it was written entirely in Italian. In July 1979, Tattilo announced plans to publish an English language version of PLAYMEN in the United States. Shortly thereafter, PEI brought suit against Tattilo to enjoin Tattilo’s use of the name PLAY-MEN in connection with a male sophisticate magazine and related products. PEI has published the well-known male entertainment magazine “PLAYBOY” since 1953, which is sold throughout the world in a multitude of foreign languages. Plaintiffs suit for injunctive relief alleged trademark infringement, false designation of origin, unfair competition based on infringement of Plaintiffs common law trademark rights, and violations of the New York Anti-Dilution Statute.
 
 [1]
 

 A permanent injunction was awarded on April 1, 1981, and a judgment subsequently entered on June 26, 1981, permanently enjoining Tattilo from:
 

 a. using the word “PLAYMEN” or any word confusingly similar therewith as or in the title, as or in the subtitle, or anywhere else on the cover of a male sophisticate magazine, published, distributed or sold in the United States;
 

 b. publishing, printing, distributing or selling in the United States and importing into or exporting from the United States an English language male sophisticate magazine which uses the word “PLAY-MEN” or any word confusingly similar therewith as or in the title, as or in the subtitle, or anywhere else on the cover of such magazine; and
 

 c. using “PLAYBOY”, “PLAYMEN” or any other word confusingly similar with either such word in or as part of any trademark, service mark, brand name, trade name or other business or commercial designation, in connection with the sale, offering for sale or distributing in the United States, importing into or exporting from the United States, English language publications and related products.
 

 Declaration of David R. Francescani, Attorney for Playboy, dated February 27, 1996 (“Francescani Deck”) Ex. 1.
 

 PEI was similarly successful in enjoining the use of the PLAYMEN name in the courts of England, France and West Germany. However, the Italian courts ruled that “lexically” PLAYBOY was a weak mark and not entitled to protection in that country.
 
 See Playboy Enters., Inc. v. Chuckleberry Publishing, Inc.,
 
 687 F.2d 563, 569 n. 3 (2d Cir.1982). The publication of PLAYMEN in Italy continues to the present day.
 

 On approximately January 22, 1996, PEI discovered that Tattilo had created an Internet site featuring the PLAYMEN name.
 
 [2]
 
 
 *1035
 
 This Internet site makes available images of the cover of the Italian magazine, as well as its “Women of the Month” feature and several other sexually explicit photographic images. Users of the Internet site also receive “special discounts” on other Tattilo products, such as CD ROMs and Photo CDs. Tattilo created this site by uploading these images onto a World Wide Web server located in Italy. These images can be accessed at the Internet address “http://www.playmen.it.”
 
 [3]
 

 Two distinct services are available on the PLAYMEN Internet site. “PLAYMEN Lite” is available without a paid subscription, allowing users of the Internet to view moderately explicit images via computer. It appears that the main (if not sole) purpose of the PLAYMEN Lite service is to allow prospective users to experience a less explicit version of the PLAYMEN product before committing to purchasing a subscription. In addition, the PLAYMEN Internet site offers the more sexually explicit service called “PLAYMEN Pro.” PLAYMEN Pro is available only to users who have paid the subscription price.
 

 In order to access the Lite version of the PLAYMEN Internet service, the prospective user must first contact Tattilo. The user will then receive a temporary user name and password via e-mail. To subscribe to PLAY-MEN Pro, the prospective user must fill out a form and send it via fax to Tattilo. Within 24 hours, the user receives by e-mail a unique password and login name that enable the user to browse the PLAYMEN Pro service.
 

 The PLAYMEN Internet site is widely available to patrons living in the United States. More to the point,
 
 anyone
 
 in the United States with access to the Internet has the capacity to browse the PLAYMEN Internet site, review, and obtain print and electronic copies of sexually explicit pages of PLAYMEN magazine. Franeescani Decl. ¶4. All that is required to establish the account is the brief contact with Tattilo outlined above.
 

 II.
 
 The Standard for Holding a Party in Contempt
 

 It is well settled that “‘[t]he power to punish for contempts is inherent in all courts.’”
 
 Chambers v. NASCO, Inc.,
 
 501 U.S. 32, 44, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991) (quoting
 
 Ex parte Robinson,
 
 19 Wall. 505, 510, 22 L.Ed. 205 (1874)). This inherent power “reaches both conduct before the court and that beyond the court’s confines, for ‘[t]he underlying concern that gave rise to the contempt power was not ... merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial.’”
 
 Id.
 
 (quoting
 
 Young v. U.S. ex rel. Vuitton et Fils S.A.,
 
 481 U.S. 787, 798, 107 S.Ct. 2124, 2132-33, 95 L.Ed.2d 740 (1987));
 
 see also In re Weiss,
 
 703 F.2d 653, 660 (2d Cir.1983) (“acts of willful disobedience to clear and unambiguous orders of the court constitute contempt of court”).
 

 An order of contempt “is a potent weapon, to which courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant’s conduct.”
 
 King v. Allied Vision, Ltd.,
 
 65 F.3d 1051, 1058 (2d Cir.1995) (citations omitted). A contempt order is warranted only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court’s edict.
 
 Id.; see also Hart Schaffner & Marx v. Alexander’s Dep’t Stores, Inc.,
 
 341 F.2d 101, 102 (2d Cir.1965).
 

 Generally, the purpose of holding a party in civil contempt is “to enforce compliance with an order of the court or to compensate for losses or damages.”
 
 Powell v.
 
 
 *1036
 

 Ward,
 
 643 F.2d 924, 931 (2d Cir.1981) (citation omitted). A court has the power to hold a party in civil contempt when (1) there is a “clear and unambiguous” court order; (2) there is clear and convincing proof of noncompliance; and (3) the party has not attempted to comply in a reasonably diligent manner.
 
 New York State Nat’l Org. for Women v. Terry,
 
 886 F.2d 1339, 1351 (2d Cir.1989),
 
 cert. denied,
 
 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990);
 
 see also McComb v. Jacksonville Paper Co.,
 
 336 U.S. 187, 191, 69 S.Ct. 497, 499-500, 93 L.Ed. 599 (1949). A “clear and unambiguous” order is one “specific and definite enough to apprise those within its scope of the conduct that is being proscribed.”
 
 Terry,
 
 886 F.2d at 1352 (citation omitted). The alleged contemnor “must be able to ascertain from the four comers of the order precisely what acts are forbidden.”
 
 Drywall Tapers and Pointers of Greater New York, Local 1974 v. Local 530 of Operative Plasterers and Cement Masons Int’l Ass’n,
 
 889 F.2d 389, 395 (2d Cir.1989),
 
 cert. denied,
 
 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990). Finally, failure to comply with the court order need not be willful.
 
 Canterbury Belts, Ltd. v. Lane Walker Rudkin, Ltd.,
 
 869 F.2d 34, 39 (2d Cir.1989).
 

 III.
 
 Discussion
 

 The primary issue before the Court is whether the Defendant distributed or sold the PLAYMEN magazine in the United States when it established an Internet site containing pictorial images under the PLAY-MEN name.
 
 [4]
 

 A.
 
 Whether the Injunction Could Have Been Violated
 

 As an initial matter, the question arises whether a fifteen-year-old injunction prohibiting certain traditional publishing activities should be applied to the recent development of cyberspace and the Internet. If the dissemination of information over the Internet, in any form, cannot constitute a violation of the Injunction, then the inquiry is over.
 

 Defendant argues that because this case involves the new technology of the Internet and World Wide Web — which purportedly did not exist when the Injunction was issued — the complained of activities cannot be “clearly and unambiguously” barred.
 

 The 1981 Injunction was issued with respect to the publication and distribution in the United States of print magazines bearing on their cover the name P[LAYMEN]. Plainly, it does not bar the conduct at issue, placing pictorial images on the World Wide Web in Italy, which conduct was not contemplated by any of the parties involved in framing the 1981 Injunction, let alone addressed in that judgment.
 

 Defendant’s Memorandum in Opposition to the Motion for Contempt (“Def.Mem.”) at 7.
 

 This argument is premised on the belief that the Internet did not exist in 1981. While it is difficult, if not impossible, to establish a definite “birth date” for this new medium, it appears that the Internet did in fact exist in some form when the Injunction was entered fifteen years ago.
 
 See, e.g.,
 
 The Birth of the Internet,
 
 Newsweek,
 
 August 8, 1994, at 56. The beginnings of the Internet date back to 1969, when the Department of Defense’s Advanced Research Project Agency funded a project called ARPANET for the purpose of developing a computer network which would enable researchers around the country to share ideas.
 
 Id.
 
 On that date in 1969, four universities were linked by a computer network for the first time. The number of network sites, called “nodes,” gradually increased to nearly two dozen in 1971 and 62 three years later.
 
 Id.
 
 By 1981, more than 200 network sites had been established. Today, users of publicly available news groups discuss “everything from particle physics to Barney the dinosaur.”
 
 Id.; see also American Civil Liberties Union v. Reno,
 
 929 F.Supp. 824, 831-32 (E.D.Pa.1996).
 

 
 *1037
 
 Nevertheless, I agree with the Defendant that the availability of pictorial images on the Internet could not have been contemplated at the time of the Injunction. While the Internet may have existed in some form in 1981, it was undeniably vastly different from today’s extensive montage of data available in multimedia format. In 1981, the Internet was a means to exchange text-based information, primarily by posting messages on public electronic “bulletin boards” and by sending electronic mail. Today, of course, the Internet can be seen as its own thriving city, where citizens meet to exchange thoughts and ideas, where merchants buy and sell then-wares, and where visitors take virtual tours of entire cities and buildings such as the White House and the Louvre. Certainly, only the most active imagination could have contemplated the public dissemination of pictorial images over the Internet when the Injunction was entered in 1981.
 

 The key date, then, is the start of the Internet as it exists today. The Internet, defined narrowly, dates from the time that advanced computer technology made it possible to view, manipulate and exchange pictorial images electronically on a home computer. This was no earlier than the late 1980s, when the microprocessor speed and memory capacity of home computers first allowed large quantities of data to be stored and transferred quickly. Regardless of the exact date, this use could not have been contemplated at the time the Injunction was entered.
 

 Defendant argues that because the Internet (as it now exists) could not have been contemplated by the parties in 1981, the distribution of pictorial images over that medium cannot be barred. Specifically, Defendant argues that “as Internet use was not contemplated by any of the participants who had a hand in shaping [the Injunction], ... there is ground to doubt the wrongfulness of the defendant’s conduct.” Def.Mem. at 18 (citation omitted).
 

 I disagree. That this use of the images could not have been contemplated by the parties does not prevent the Injunction from applying to the modern technology of the Internet and the World Wide Web. The purpose behind the Injunction was to restrict the ability of Defendant to distribute its product in the United States, where it has been found to infringe upon the trademark of Playboy. Allowing the Defendant to contravene the clear intent of the Injunction by permitting it to distribute its pictorial images over the Internet would emasculate the Injunction. The Injunction’s failure to refer to the Internet by name does not limit its applicability to this new medium. Injunctions entered before the recent explosion of computer technology must continue to have meaning.
 

 Finally, Defendant argues that the determination of this issue properly falls under the purview of the legislature. In support of this position, Defendant cites a recent Wisconsin case,
 
 It’s In the Cards, Inc. v. Fuschetto,
 
 193 Wis.2d 429, 535 N.W.2d 11 (Ct.App.1995). The issue presented there was whether a posting on an electronic bulletin board located on “SportsNet” was a periodical within the meaning of section 895.05(2) of the Wisconsin statutes. In holding that the posting was not a periodical, the court stated:
 

 [S]ubsee. (2) of § 895.05, STATS., was repealed in 1951 and reenacted in its present form, years before cyberspace was envisioned. The magnitude of computer networks and the consequent communication possibilities were non-existent at the time this statute was enacted. Applying the present libel laws to cyberspace or computer networks entails rewriting statutes that were written to manage physical, printed objects, not computer networks or services. Consequently, it is for the legislature to address the increasingly common phenomenon of libel and defamation on the information superhighway---- Therefore, we conclude that extending the definition of ‘periodical’ under § 895.05(2), STATS., to include network bulletin board communications on the SportsNet computer service is judicial legislation in which we will not indulge.
 

 Id.
 
 535 N.W.2d at 14^15.
 

 This reasoning has no application to the matter now before this Court.
 
 Cards
 
 dealt solely with the issue of whether a statute could be interpreted to cover the new technology of the Internet. The
 
 Cards
 
 court
 
 *1038
 
 declined to address this issue because it correctly concluded that any extension of the scope of a statute is within the sole province of the legislature. The instant situation, however, is distinguishable. While
 
 Cards
 
 concerned the interpretation of a statute, this matter involves the interpretation of and compliance with an order entered by this Court. The legislature does not have jurisdiction to determine the scope of a court order. This task is assigned to the Court.
 

 In sum, the Injunction controls the activities complained of here, despite the fact that the Internet in its current form did not exist (and, moreover, could not have been contemplated by the parties) when the Injunction was entered. Prohibition of the sale or distribution of the PLAYMEN magazine within the United States thus extends to the Internet.
 

 B.
 
 Whether the Injunction Was Violated
 

 Subsection 1(c) of the Injunction permanently enjoined Tattilo from:
 

 using “PLAYBOY”, “PLAYMEN” or any other word confusingly similar with either such word in or as part of any trademark, service mark, brand name, trade name or other business or commercial designation, in connection with the sale, offering for sale or distributing in the United States, importing into or exporting from the United States, English language publications and related products.
 

 Three conditions must be met to support a finding of a violation of this provision. First, the word PLAYMEN must have been used as part of any trademark, service mark, brand name, trade name or other business or commercial designation. Second, such use must have been in connection with an English language publication or related product. Third, such use must have been made in connection with a sale or distribution within the United States.
 

 There is ample evidence that the word PLAYMEN has been used as a trade name or business or commercial designation of the Internet site. As mentioned above, the site’s URL, which typically remains displayed on the computer screen once the site is accessed, is “playmen.it.” Moreover, the word PLAYMEN prominently appears (along with the PLAYMEN logo) in oversized font on the site’s “home page,” the electronic equivalent of a magazine cover and table of contents. The PLAYMEN name and logo appear in this same form at the top of each “page” accessed on the site. The site’s address, and the prominence of the PLAYMEN name, demonstrate an association between the PLAYMEN name and the Internet site.
 

 Similarly, the PLAYMEN name has been used in connection with an English language publication or related product. First, although there is an intriguing question as to whether an Internet site consisting of uploaded pictorial images constitutes a “publication,” there is no doubt that the “related product” clause is satisfied by this use. Second, this product appears in the English language. Although a portion of the text is written in Italian, enough sections appear in English to allow an English-speaking user to navigate the site with ease.
 
 [5]
 
 Paramount among these is the PLAYMEN page purportedly answering frequently asked questions about the Internet site, such as the price of a subscription (“$30 U.S., or 50000 [sic] Italian lire for 6 months, payable by all major credit cards”), benefits of a subscription (“You get a unique password, that can be used only by one person at a time, to browse on Playmen Pro, where you can find about 500 xxx rated pictures always updated, mpeg movies, photo cd images, and many other things”), and a description of the PLAYMEN magazine itself (“The ‘Playmen’ magazine is written in Italian, and is sold in Italy and all the major countries in Europe”). Therefore, the English language publication/related product requirement has been met.
 

 
 *1039
 
 The final condition — for a distribution or sale to have taken place within the United States — is analytically more difficult. The question of whether uploading pictorial images onto a computer which may be accessed by other users constitutes a “distribution” has been addressed by at least two courts. In
 
 Playboy Enterprises, Inc. v. Frena,
 
 839 F.Supp. 1552 (M.D.Fla.1993), Defendant Frena operated a subscription electronic bulletin board service accessible by computer modem. Once logged onto the service, subscribers could browse through different directories and view unauthorized copies of PEI’s copyrighted photographs, as well as download and store these images on their home computers.
 
 Id.
 
 at 1554. The court held that the unauthorized uploading of copyrighted images with the knowledge that the images would be downloaded by other bulletin board subscribers constituted a distribution.
 
 Id.
 
 at 1556. Similarly, in
 
 Religious Technology Center v. Netcom On-Line Communication Servs., Inc.,
 
 907 F.Supp. 1361 (N.D.Cal.1995), copyright holders brought an infringement action against the operator of an Internet access provider, seeking to hold the defendant liable for copyright infringement committed by a bulletin board subscriber. In that case, the court refused to extend the
 
 Frena
 
 doctrine to an Internet access provider, because Netcom did not create or control the content of the information available to its subscribers.
 

 Although the Internet consists of many different computers networked together, some of which may contain infringing files, it does not make sense to hold the operator of each computer liable as an infringer merely because his or her computer is linked to a computer with an infringing file. It would be especially inappropriate to hold liable a service that acts more like a conduit, in other words, one that does not itself keep an archive of files for more than a short duration. Finding such a service liable would involve an unreasonably broad construction of public distribution and display rights.
 

 907 F.Supp. at 1372.
 

 Here, Defendant does more than simply provide access to the Internet. It also provides its own services, PLAYMEN Lite and PLAYMEN Pro, and supplies the content for these services. Moreover, as in
 
 Frena,
 
 these pictorial images can be downloaded to and stored upon the computers of subscribers to the service. In fact, Defendant actively invites such use: the Internet site allows the-user to decide between viewing and downloading the images. Thus this use of Defendant’s Internet site constitutes a distribution.
 

 In order to violate the Injunction, however, Defendant must distribute the pictorial images within the United States. Defendant argues that it is merely posting pictorial images on a computer server in Italy, rather than distributing those images to anyone within the United States. A computer operator wishing to view these images must, in effect, transport himself to Italy to view Tattilo’s pictorial displays. The use of the Internet is akin to boarding a plane, landing in Italy, and purchasing a copy of PLAY-MEN magazine, an activity permitted under Italian law. Thus Defendant argues that its publication of pictorial images over the Internet cannot be barred by the Injunction despite the fact that computer operators can view these pictorial images in the United States.
 

 Once more, I disagree. Defendant has actively solicited United States customers to its Internet site, and in doing so has distributed its product within the United States. When a potential subscriber faxes the required form to Tattilo, he receives back via email a password and user name. By this process, Tattilo distributes its product within the United States.
 

 Defendant’s analogy of “flying to Italy” to purchase a copy of the PLAYMEN magazine is inapposite. Tattilo may of course maintain its Italian Internet site. The Internet is a world-wide phenomenon, accessible from every corner of the globe. Tattilo cannot be prohibited from operating its Internet site merely because the site is accessible from within one country in which its product is banned. To hold otherwise “would be tantamount to a declaration that this Court, and every other court throughout the world, may assert jurisdiction over all information providers on the global World Wide Web.” Def.Mem. at 2. Such a holding
 
 *1040
 
 would have a devastating impact on those who use this global service. The Internet deserves special protection as a place where public discourse may be conducted without regard to nationality, religion, sex, age, or to monitors of community standards of decency.
 
 See generally American Civil Liberties Union v. Reno,
 
 929 F.Supp. 824 (E.D.Pa.1996).
 

 However, this special protection does not extend to ignoring court orders and injunctions. If it did, injunctions would cease to have meaning and intellectual property would no longer be adequately protected. In the absence of enforcement, intellectual property laws could be easily circumvented through the creation of Internet sites that permit the very distribution that has been enjoined. Our long-standing system of intellectual property protections has encouraged creative minds to be productive. Diluting those protections may discourage that creativity.
 

 While this Court has neither the jurisdiction nor the desire to prohibit the creation of Internet sites around the globe, it may prohibit access to those sites in
 
 this
 
 country. Therefore, while Tattilo may continue to operate its Internet site, it must refrain from accepting subscriptions from customers living in the United States. In accord with this holding, an Italian customer who subsequently moves to the United States may maintain his or her subscription to the Internet site.
 

 I therefore conclude that Tattilo has ■violated subsection 1(c) of the Injunction by using its PLAYMEN Internet site to distribute its products in the United States.
 
 [6]
 
 The clear intent of the Injunction was to prohibit Tattilo from selling its PLAYMEN magazine and related products to United States customers. Tattilo has knowingly attempted to circumvent the Injunction by selling its products over the Internet. Cyberspace is not a “safe haven” from which Tattilo may flout the Court’s Injunction.
 

 C.
 
 The $5,000 Past Due Payment
 

 Paragraph 4 of the Injunction required Tattilo to pay PEI $5,000 as partial payment of its attorneys’ fees incurred in the original action.
 
 [7]
 
 Francescani Decl. Ex. 1. PEI contends that Tattilo never paid .this amount, and asks for it now, fifteen years later.
 

 Defendant argues that this payment is barred by laches. “To prove laches, a party asserting the defense must show (1) lack of diligence by the party against whom the defense is asserted and (2) prejudice.”
 
 Southside Fair Housing Comm. v. City of New York,
 
 928 F.2d 1336, 1354 (2d Cir. 1991). Factors used to assess prejudice include whether delay has resulted in a loss of records, unavailability of witnesses, or an activity taken in detrimental reliance on the
 
 *1041
 
 failure to prosecute.
 
 See, e.g., Merchant v. Lymon,
 
 828 F.Supp. 1048, 1063 (S.D.N.Y. 1993).
 

 Here, both the relevant records and one of the potential payees — Chucldeberry — have vanished.
 
 See
 
 Affidavit of Adelina Tattilo, Managing Director of Tattilo Editrice S.p.A, dated April, 1996, ¶ 22 and Ex. C. These are sufficient reasons to bar recovery of this sum under the doctrine of laches.
 
 [8]
 

 IV.
 
 Sanctions
 

 Sanctions for “indirect” civil contempt — contempt resulting from actions occurring outside the courtroom — are designed specifically to compel future compliance with a court order and are avoidable through compliance.
 
 Int’l Union, United Mine Workers of America v. Bagwell,
 
 — U.S. -, -, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642 (1994);
 
 see also Gompers v. Bucks Stove & Range Co.,
 
 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911) (“[W]hen a court imposes fines and punishments on a eontemnor, it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law’s purpose of modifying the contemnor’s behavior to conform to the terms required in the order.”). Such sanctions may be imposed “in an ordinary civil proceeding upon notice and an opportunity to be heard.”
 
 Int’l Union,
 
 — U.S. at-, 114 S.Ct. at 2557. Neither a jury trial nor proof beyond a reasonable doubt is necessary.
 
 Id.
 

 Tattilo is required, within two weeks of the date of this Order, to: (1) either shut down its Internet site completely or refrain from accepting any new subscriptions from customers residing in the United States; (2) invalidate the user names and passwords to the Internet site previously purchased by United States customers; (3) refund to its United States customers the remaining unused portions of their subscriptions; (4) remit to PEI all gross profits earned from subscriptions to its Internet service by customers in the United States; (5) remit to PEI all gross profits earned from the sale of goods and services advertised on its PLAY-MEN Internet service to customers in the United States; (6) revise its Internet site to indicate that all subscription requests from potential United States customers will be denied; and (7) remit to PEI its costs and attorney’s fees incurred in making this application. If these conditions have not been met within the stated two-week period, Tattilo shall pay to PEI a fine of $1,000 each day thereafter until it fully complies with this Order.
 

 V.
 
 Conclusion
 

 For the foregoing reasons, the motion for a finding of contempt is granted.
 

 SO ORDERED.
 

 OPINION AND ORDER ON RECONSIDERATION
 

 SCHEINDLIN, District Judge:
 

 I.
 
 Background
 

 Plaintiff, Playboy Enterprises, Inc. (“PEI”), publishes the well-known male entertainment magazine “Playboy.” Defendant, Tattilo Editrice, S.p.A. (“Tattilo”), has published a male sophisticate magazine in Italy under the name “PLAYMEN” since 1967. In 1979, after Tattilo announced plans to publish an English language version of PLAYMEN in the United States, PEI brought suit to enjoin Tattilo’s use of the PLAYMEN name in connection with a male sophisticate magazine and related products. As a result, PEI was awarded an injunction (“Injunction”) permanently enjoining Tattilo from:
 

 
 *1042
 
 a. using the word “PLAYMEN” or any word confusingly similar therewith as or in the title, as or in the subtitle, or anywhere else on the cover of a male sophisticate magazine, published, distributed or sold in the United States;
 

 b. publishing, printing, distributing or selling in the United States and importing into or exporting from the United States an English language male sophisticate magazine which uses the word “PLAY-MEN” or any word confusingly similar therewith as or in the title, as or in the subtitle, or anywhere else on the cover of such magazine; and
 

 c. using “PLAYBOY”, “PLAYMEN” or any other word confusingly similar with either such word in or as part of any trademark, service mark, brand name, trade name or other business or commercial designation, in connection with the sale, offering for sale or distributing in the United States, importing into or exporting from the United States, English language publications and related products.
 

 Declaration of David R. Franeeseani, Attorney for Playboy, dated February 27, 1996 (“Franeeseani Decl.”) Ex. 1.
 

 Fifteen years later, in January 1996, PEI discovered that Tattilo had created an Internet site featuring the PLAYMEN name (the “PLAYMEN Internet site” or “Internet site”) which makes available images of the cover of the Italian magazine, as well as its “Women of the Month” feature and several other sexually explicit photographic images. The Internet site was created by uploading images onto a World Wide Web server located in Italy.
 

 Tattilo offers two services on its Internet site. “PLAYMEN Lite” is available without a subscription and allows users of the Internet to view moderately explicit images. “PLAYMEN Pro,” which offers more explicit images, is available only upon the purchase of a paid subscription. It appears that the main (if not sole) purpose of the PLAYMEN Lite site is to allow prospective subscribers to PLAYMEN Pro to sample the product before purchasing a subscription.
 

 PEI moved for a finding of contempt against Tattilo. By Opinion and Order dated June 19, 1996 (“Opinion”), I determined that the Internet site violated the Injunction, and thereby found Tattilo in contempt. Tattilo was ordered, within two weeks, to: (1) either shut down its Internet site completely or refrain from accepting any new subscriptions from customers residing in the United States; (2) invalidate the user names and passwords to the Internet site previously purchased by United States customers; (3) refund to its United States customers the remaining unused portions of their subscriptions; (4) remit to PEI all gross profits earned from subscriptions to its PLAYMEN Pro Internet service by customers in the United States; (5) remit to PEI all gross profits earned from the sale of goods and services advertised on its PLAYMEN Internet service to customers in the United States; (6) revise its Internet site to indicate that all subscription requests from potential United States customers will be denied; and (7) remit to PEI its costs and attorneys’ fees incurred in making that application. I further ruled that if those conditions were not met within two weeks, Tattilo shall pay to PEI a fine of $1,000 per day until it complies fully.
 

 Defendant now requests that the Court amend its Order in several respects. First, Defendant submits that the Court misconstrued the process by which a user of the Internet site accesses PLAYMEN Lite, resulting in the incorrect determination that the PLAYMEN Lite service violated the Injunction. Defendant argues that the continued availability of PLAYMEN Lite within the United States would not violate the Injunction. Second, Defendant requests that the Order be amended to eliminate the award of attorneys’ fees and costs to PEI, as well as Tattilo’s gross profits from subscriptions and sales of products to customers residing in the United States.
 
 [1]
 

 
 *1043
 
 Plaintiff also moves for an amendment of the judgment. PEI requests that Tattilo be ordered to refrain from “publishing, promoting and selling in the English language PLAYMEN publications and related products.”
 

 II.
 
 Standard of Review
 

 Both parties are seeking reconsideration of the Opinion. A court should grant such motions “only if the moving party presents [factual] matters or controlling decisions the court overlooked that might materially have influenced its earlier decision.”
 
 Morser v. AT & T Information Systems,
 
 715 F.Supp. 516, 517 (S.D.N.Y.1989);
 
 see also Violette v. Armonk Assocs., L.P.,
 
 823 F.Supp. 224, 226 (S.D.N.Y.1993). Moreover, a motion for reconsideration may not be used to plug gaps in an original argument
 
 (see McMahan & Co. v. Donaldson, Lufkin & Jenrette Securities Corp.,
 
 727 F.Supp. 833, 833-34 (S.D.N.Y. 1989)) or “to argue in the alternative once a decision has been made”
 
 (see United States v. Reyes,
 
 91-CR-56S, 1993 WL 8775, at *1 (W.D.N.Y. Jan. 13,1993)).
 

 III.
 
 Discussion
 

 A. Whether PLAYMEN Lite Violates the Injunction
 

 In the Opinion, Defendant was found to have violated Subsection 1(c) of the 1981 Injunction which permanently enjoined Tattilo from:
 

 using “PLAYBOY”, “PLAYMEN” or any other word confusingly similar with either such word in or as part of any trademark, service mark, brand name, trade name or other business or commercial designation, in connection with the sale, offering for sale or distributing in the United States, importing into or exporting from the United States, English language publications and related products.
 

 The basis for this holding was the Court’s finding that 1) the word PLAYMEN was used as part of a trademark, service mark, brand name, trade name or other business or commercial designation; 2) that such use was made in connection with an English language publication or related product; and 3) that such use was made in connection with a sale or distribution within the United States, The sole issue raised in this request for reconsideration is whether Tattilo has sold or distributed PLAYMEN Lite in the United States.
 

 1.
 
 The Previous Order
 

 The uploading • of pictorial images onto a computer which may be accessed by other users constitutes a “distribution” because
 

 Defendant does more than simply provide access to the Internet. It also provides its own services, PLAYMEN Lite and PLAY-MEN Pro, and supplies the content for these services. Moreover, ..., these pictorial images can be downloaded to and stored upon the computers of subscribers to the service. In fact, Defendant actively invites such use: the Internet site allows the user to decide between viewing and downloading the images. Thus this use of Defendant’s Internet site constitutes a distribution.
 

 Opinion at 1039.
 

 This distribution occurred in the United States because of the direct contact between Tattilo and users of the PLAYMEN Internet site.
 
 Id.
 
 at 1039. Specifically, in order to subscribe to the PLAYMEN Pro service, prospective users fax an “order form” to Tattilo, along with a credit card number, and receive back a password and user ID via email.
 

 Although users of the PLAYMEN Internet site do not “subscribe” to PLAYMEN Lite, Tattilo nonetheless distributes this product in the United States because of the means by which a user accesses PLAYMEN Lite, which is described on the Internet site itself:
 

 Before I pay I want to see what you offer:
 

 For this reason, you will receive a temporary user name and password by email. With this password you can browse on the xxx pages of the lite version of Playmen. Once you are satisfied, you will have to fill the
 
 form
 
 and send it [to] us by fax, specifing [sic] all the details of your credit card.
 

 
 *1044
 
 2.
 
 The Instant Motion
 

 Tattilo now claims that the above passage does not accurately describe the process by which a user accesses PLAYMEN Lite. According to Tattilo, not only is a password not necessary to peruse the PLAYMEN Lite service, but in reality
 
 no
 
 contact with Tattilo is required for a potential user to access PLAYMEN Lite. •
 

 On July 3, 1996, a hearing was held at which the parties demonstrated the process of accessing the PLAYMEN Internet site. No password or user ID was necessary. Defendant has therefore presented factual matter which was not before the Court' that might materially have influenced its earlier decision.
 
 [2]
 
 The question, then, is whether Tattilo’s PLAYMEN Lite service still violates the Injunction.
 

 While the Opinion held that deliberate and intentional contact with the United States was established based on the requirement that prospective customers fax subscription forms to Italy, and that user names and IDs are sent to United States customers from Italy, this is not the only basis for finding that a distribution occurred within the United States. The PLAYMEN Lite service allows (indeed invites) a user to download Tattilo’s pictorial images onto his or her home computer. PLAYMEN Lite can thus be viewed as an “advertisement” by which Tattilo distributes its pictorial images throughout the United States. That the local user “pulls” these images from Tattilo’s computer in Italy, as opposed to Tattilo “sending” them to this country, is irrelevant. By inviting United States users to download these images, Tattilo is causing and contributing to their distribution within the United States.
 

 Moreover, the availability of PLAYMEN Lite within the United States violates the Injunction even if the user could not download the images. PLAYMEN Lite is nearly identical to PLAYMEN Pro. Both reveal many of the same images; both allow the user to download these images; both services purport to sell products such as movies and CD-Roms to their users.
 
 [3]
 
 Most notably, as demonstrated at the hearing, the two services utilize many of the same screens and links.
 

 This implies that PLAYMEN Lite and PLAYMEN Pro are not two separate and distinct services as Defendant has argued, but are actually one service — the “PLAY-MEN Internet Service” — part of which requires a password and part of which does not. In other words, PLAYMEN Lite is nothing more than an “advertisement” or “coming attractions” for the money-making PLAYMEN Pro service. This relationship is further demonstrated by the passage quoted above, which caused confusion as to how a user accesses PLAYMEN Lite. When a PLAYMEN Lite user is considering purchasing a subscription to PLAYMEN Pro, but would like to sample the product first, Tattilo will provide a temporary password that will allow the user to access the pages of PLAY-MEN Pro through PLAYMEN Lite.
 

 As such, PLAYMEN Lite represents a free distribution of Tattilo’s product, a product which has been banned in this country since the 1981 Injunction. I decline to hold that Tattilo may maintain some portion of its service but shut down other portions of its Internet site. Because PLAYMEN Lite and PLAYMEN Pro are essentially one entity, they must be treated as such.
 

 Therefore, the PLAYMEN Lite service violates the Injunction. As ordered in the Opinion, Tattilo must either shut down PLAYMEN Lite completely or prohibit United States users from accessing the site in the future. The simplest method of prohibiting access by United States users is to adopt a method of access similar to the one which I had believed was already in place: require users of the PLAYMEN Lite service to ac
 
 *1045
 
 quire free passwords and user IDs in order to access the site. In this way, users residing in the United States can be filtered out and refused access.
 
 [4]
 

 Because this motion raised serious issues, Tattilo may have two weeks from the date of this Order to either shut down PLAYMEN Lite or adopt procedures prohibiting United States users from accessing the site. Of course, this does not affect the time remaining for Tattilo to comply with the earlier Order.
 

 B.
 
 The Award of Attorneys’ Fees and Costs
 

 There is no basis for reconsideration of the decision to impose attorneys’ fees and costs upon Tattilo. As previously stated, Tattilo had sufficient cause to doubt the legality of establishing the PLAYMEN Internet site. Defendant cannot avoid this sanction simply because the contempt motion may raise an issue of first impression.
 

 C.
 
 The Award of Tattilo’s Gross Profits
 

 Similarly, there is no basis for reconsideration of the decision to award PEI Tattilo’s gross profits from subscriptions and sales of products to United States customers. Consistent with my decision not to reconsider attorney’s fees and costs, Defendant cannot avoid this sanction simply because the contempt motion may raise an issue of first impression.
 

 D.
 
 PBFs Request For an Additional Sanction
 

 PEI has also failed to set forth any ground for reconsideration. As previously stated, this Court has no power to restrict Tattilo from providing its PLAYMEN Internet service outside the United States. There are many English speaking countries throughout the world. This Court has no jurisdiction to control Tattilo’s activities in those countries. As a result, PEI’s motion for an order prohibiting Tattilo from using English on its Internet site is denied.
 

 IV.
 
 Conclusion
 

 For the foregoing reasons, the motion for reconsideration is denied. Tattilo must shut down the PLAYMEN Lite service in accord with this Opinion.
 

 SO ORDERED.
 

 Dated: July 12, 1996.
 

 [1]
 

 . A concise summary of the facts of the underlying suit is set forth in
 
 Playboy Enters., Inc. v. Chuckleberry Publishing, Inc.,
 
 687 F.2d 563 (2d Cir.1982).
 

 [2]
 

 . For a thorough description of the Internet, see
 
 American Civil Liberties Union v. Reno,
 
 929 F.Supp. 824, 830-49 (E.D.Pa.1996). In general, the Internet is a giant network which allows people, institutions, corporations and govern
 
 *1035
 
 ments around the globe to exchange information via computer almost instantaneously.
 

 [3]
 

 . Internet addresses, such as the one at issue here, typically include a final extension to their "uniform resource locator” ("URL”). To United States users of the Internet, the most familiar URL extensions are ".com” (indicating that the accessed computer is commercial); “.edu” (educational); ".org" (non-profit organization); “.gov” (government agency); and ".net" (networking organization). In comparison, ".it”— such as appears in the PLAYMEN Internet site address "http://www.playmen.it” — indicates that the accessed computer is located in Italy.
 

 [4]
 

 . Defendant first argues that this Court has neither personal nor subject matter jurisdiction to determine the issues raised herein. Tattilo is an Italian corporation with no agent or office within the United States; it does not sell, distribute. publish or advertise for its text-based Italian PLAYMEN magazine in this country. However, this Court retained jurisdiction over Defendant for the purposes of enforcing the 1981 Injunction.
 

 [5]
 

 . For example, the page at "http://www.playmen.it/play/photgirl.htm” states in English: "Here you can found (sic) a list of the Playgirls published in the previuos (sic) issues of Playmen. We start from the Playgirl of September 1995,
 
 Becky!
 
 After this____you'll find an a excellent list of “beautiful” link, that guide you to the most exciting girls in the World! ... Stop! Cool Fun with Playmen.”
 

 [6]
 

 . I do not foreclose the possibility that Subsections 1(a) and 1(b) of the Injunction have been violated as well. I have already determined that the Internet use constitutes a distribution within the United States, and that the Internet site constitutes an English language publication. In addition to these requirements, in order to find a violation of Subsections 1(a) and 1(b), the word PLAYMEN must have been used in the title, subtitle or anywhere else on the cover of a male sophisticate magazine. If I were to find that the Internet site constitutes a "magazine,” then its home page, as the first screen viewed upon accessing the site, is unquestionably its cover.
 

 The sole issue, then, is whether the Internet site constitutes a "magazine.” Although I need not reach this issue today, I believe that it does. According to Webster’s Dictionary, the word “magazine” was at one time used in book titles to mean a "storehouse of information” on a special topic, equivalent to the use of "encyclopedia" today.
 
 Webster's II New Riverside University Dictionary
 
 714 (Houghton Mifflin Co. 1994). The word was also used in titles of periodical publications "that contained a storehouse of miscellaneous literary works, articles on various topics, and other features."
 
 Id.
 
 From this latter use, the word took on the meaning that is familiar today:, a periodical containing a collection of articles, stories, pictures, or other features.
 
 Id.
 

 The PLAYMEN Internet site bears these attributes. First, the "periodical” requirement is satisfied. New pictorial images are uploaded monthly; indeed, the "Playgirls Calendar” feature indicates that images of women representing future months can be viewed only when the “new issue” has been uploaded. Second, while the site consists almost exclusively of pictures, the absence of articles and stories does not destroy its status as a magazine.
 

 [7]
 

 . Specifically, the 1981 Injunction provided that "Defendant Chuckleberry Publishing Inc. and Tattilo Editrice S.p.A. [must] pay the portion of defendant's attorneys fees and disbursements attributable to adjudication of the subtitle issue which are $5,000.”
 

 [8]
 

 . Defendant also argues that laches bars a finding of contempt. A Playboy agent first learned of the PLAYMEN Internet site on October 4, 1995, three months earlier than Plaintiff alleges it learned of the site and five to six months prior to this application. Regardless of when Plaintiff first learned of the PLAYMEN Internet site, this application is not barred by laches. A maximum of six months delay does not constitute "unreasonable delay.”
 
 See, e.g., King v. Innovation Books,
 
 976 F.2d 824, 832-833 (2d Cir.1992) (eight months between learning of improper behavior and filing suit not unreasonable delay);
 
 Landmark West! v. U.S. Postal Service,
 
 840 F.Supp. 994, 1001 (S.D.N.Y.1993) (six-month delay between groundbreaking and action seeking injunction not unreasonable). Furthermore, Defendant has not alleged any prejudice resulting from this delay, a necessary element of a laches defense.
 

 [1]
 

 . In addition, Tattilo asks that should the Court decline to eliminate the award of attorneys’ fees and costs, that the time to complete those paymente be extended until two weeks after the determination of that issue. Because PEI has no objection to this request, it is granted.
 

 [2]
 

 . Tattilo could not have presented this fact to the Court prior to this Motion, as all attempts to access the internet at an earlier hearing were unsuccessful. Defendants are therefore not precluded from raising this issue for the first time on reconsideration.
 

 [3]
 

 . These product offerings are not available on PLAYMEN Lite. When attempting to order, a message appears informing the user that "[t]his page is under construction" or ‘‘[y]our client is not allowed to access the requested object.” However, the unavailability of these products does not affect this holding.
 

 [4]
 

 . If technology cannot identify the country of origin of e-mail addresses, these passwords and user IDs should be sent by mail. Only in this way can the Court be assured that United States users are not accidentally permitted access to PLAYMEN Lite.